# EXHIBIT “A”

BROADSTREET
GLOBAL

November 14, 2025

Dear Broadstreet Investor,

It has been a distinct honor to serve each and every one of you in the past few years, but as many of you know, Broadstreet has chosen to go in a new direction. Every private equity firm reaches a point where decisions have to be made regarding the future. Some funds, from inception, announce when the fund will cease to exist. Others operate looking for opportune exits and, at that point, the fund changes direction, often closing out investors and/or transforming to a family office type of operation.

We have chosen the latter. We will be pursuing our business on a private basis. As a result, we will be providing you two options to determine how you would like to exit from your investment. The first option, known as Option A, will be to simply have you redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.

The second option, which was completely voluntary on our part, and is being given to those who desire to participate in a new real estate enterprise with a new company, is known as Option B. Option B will be a public entity that is purchasing 21 of our infrastructure projects and will involve me personally. That option will allow you to receive stock valued at three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. That stock will have restrictions on trading or liquidating, which can be as long as 42 months (or possibly less, depending on the trading volume and pricing for the public entity). Option B will not entitle you to any quarterly, monthly, or annual distributions. Your Broadstreet investment will be traded for the stock in the public entity. That stock can increase over time or decrease. That option is different from anything previously provided in your original documents that you signed. It is an entirely new venture.

In addition, I want each and every one of you to know that I personally will be taking the overwhelming majority of my compensation in the form of stock in the public enterprise and I will be the largest individual shareholder in that entity. I will be responsible for the operation of the real estate division of that enterprise. I will also have restrictions on my ability to sell my stock. I will not be permitted to sell even a single share of stock for two years, regardless of the stock price or stock volume. Although I will not be the CEO of the public company, at nearly 60 years of age, I have other goals, primarily to increase my net worth and not caring much about my actual job title. Rest assured, I will be intimately involved in this new venture. The new company will be run by a group of much younger and highly educated persons from Wharton, Harvard and Cornell who have a new economy view of real estate and financial services. They have a skill set that I simply do not possess

to lead into this new world of decentralized finance, payments, stable coins and business transactions. My focus will be the real estate operations and I hope that the company, having a new economy aspect mixed with old economy assets, will allow for the type of investment valuation that an old world real estate company simply does not command in the market place.

Nonetheless, I will be the largest shareholder, I will actively advocate for that which I believe will serve me personally best, and that is the success of the stock and any further additional benefits that I will lobby for the stock to have.

Please read the attached redemption notice and its attachments carefully. Please also read the "Additional Q&A Information Schedule," which has additional questions and answers. What is best for me, may not be best for you and vice versa. The decision is solely yours to make. I have my own opinions, but they are just that, my opinions based on my goals, you need to make your own decision.

For those of you who have been along this journey, you know that I have closed every business meeting at Broadstreet with simply three letters: DBA, meaning Don't Be Average. I have preached this mantra throughout my entire career, and it has served me well. I look forward to continuing that journey in my latest endeavor. For those of you who exit at this point, it has been an honor and a pleasure. For those of you who continue on, I strive to never disappoint and to always exceed everyone's expectations.

Sincerely,

David Feingold

DBA!!!

---

This letter contains the opinions of David Feingold in his position as CEO of Broadstreet, Inc. This letter is not a solicitation, nor is it meant to express a support for either Option A or Option B. This letter is issued as part of the informational requirement of the subscription documents and operating agreement that you executed. No information shall be relied upon other than complying with such requirements as well as Mr. Feingold's freedom of speech and expression, each investor is urged to make their own independent decision and to employ any and all professionals that they may deem necessary to make any investment decision. This letter shall not be deemed investment advice. A copy has been provided to both the SEC and corporate monitor. The SEC takes no position on the adequacy of the Redemption Notice or the merits of the Proposed Redemption Transaction.

**BROADSTREET GLOBAL FUND REDEMPTION NOTICE**

**PLEASE READ THIS NOTICE CAREFULLY.**

**CONSULT YOUR ATTORNEY, INVESTMENT ADVISOR, OR OTHER PROFESSIONAL IF NECESSARY.**

**YOUR RIGHTS AS AN INVESTOR WILL BE SUBSTANTIALLY AFFECTED—WHETHER YOU MAKE AN ELECTION OR NOT.**

**AT THE CONCLUSION OF THE REDEMPTION DISCUSSED HEREIN, YOU WILL NO LONGER BE AN INVESTOR IN THE BROADSTREET GLOBAL FUND, LLC AND YOU WILL NO LONGER RECEIVE ANY RETURNS, DISTRIBUTIONS, OR OTHER FUNDS FROM THE BROADSTREET GLOBAL FUND, LLC.**

**As an Investor in the Broadstreet Global Fund, LLC ("BSGF"), you are hereby advised of our full redemption of the entirety of your investment pursuant to Article VI of the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"), that each investor executed to become an investor with BSGF. This redemption is binding upon you whether you make an election or not; therefore, you should carefully read this notice and all information referenced in or attached to this notice.**

**REDEMPTION OVERVIEW**

BSGF, as a private equity firm, focuses on multiple business opportunities, including the sale, transfer, trade and monetization of assets when opportunities present themselves. The developer associated with many of the BSGF projects, Contender Development, Inc., was presented with multiple opportunities for the purchase of some of our assets. In response, we retained professionals, including Builder Advisor Group, an investment bank specializing in mergers and acquisitions in the land development and housing sector and FINRA member that has participated in more than half of the largest homebuilder M&A transactions over the last ten years, and signed various non-disclosure agreements to evaluate the multiple sale opportunities (individually, a "Sale Opportunity," and collectively, the "Sale Opportunities").

Some of the Sale Opportunities will generate cash from the sale of individual infrastructure and land projects and another Sale Opportunity will create the payment through common stock of a New York Stock Exchange listed company that is restricted. By "restricted," we mean the stock you would be receiving has substantial restrictions on when it can be sold (restrictions could be for up to forty-two (42) months or less, depending on the price and trading volume of the stock). All restrictions are more specifically discussed in the draft Lock-Up Agreement attached as **Item 3**.

For your redemption, you will be given two choices, and you must make a selection. Under one option (Redemption Choice – A), the investor would receive, in cash, an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The second option (Redemption Choice – B) involves providing the investor with the payment of restricted (as defined above) common stock in a company named Soulpower Acquisition Corp. (NYSE symbol: Soul), which is purchasing 21 infrastructure projects from BSGF through an entity called SWB Holdings; which will then merge into Soul with those assets from BSGF and contain approximately $250 million

in cash. You will be paid in stock equal to three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The basis of this valuation of the assets being transferred to SWB Holdings and ultimately Soulpower Acquisition Corp. is derived from a number of valuations and calculations that were received placing the assets being sold at a valuation range of a low of $487 million to a high of multiple billion. The valuation was negotiated at an arm's length basis with the buyer and priced at the high end of the range based on our agreement to accept stock with the restrictions described above. A copy of one such valuation is attached as **Item 4**.

**There will be no additional returns or consideration paid. No additional payments or preferred returns will be paid to you on or after November 14, 2025.**

**After this redemption, whether you choose choice A or B, you will no longer be an investor in BSGF, you will no longer receive preferred returns or other payments from BSGF, and there will be no additional amounts or returns paid to you by BSGF.**

## REDEMPTION PROCESS

This redemption process will be conducted exactly as specified in the Operating Agreement document, a copy of which is attached hereto as **Item 2** and also available in the BSGF data room under the tab Operating Agreement.

## REDEMPTION CHOICE – A

For the first choice of redemption, known as "Redemption Choice – A," you will simply be redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. Pursuant to the Series Supplement, you will be paid within 180 days of your redemption election. At the conclusion of this transaction, and after your payment has been made, you will no longer be an investor in BSGF.

## REDEMPTION CHOICE – B

For the second choice of redemption, known as "Redemption Choice – B," you will be paid with the payment of restricted common stock in a New York Stock Exchange listed company equal to three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The basis for this valuation of assets being transferred to SWB Holdings which will ultimately become Soulpower Acquisition Corp. is derived from a number of valuations and calculations that were received placing the assets being sold for public stock at a valuation range of a low of $487 million to a high of multiple billion. The valuation was negotiated on an arm's length basis with the buyer and priced at the high end of the range based on our agreement to accept stock with the restrictions described above. The above-mentioned Operating Agreement will no longer govern any of your rights, or any of the terms or conditions on your investment, because you will no longer be an investor in BSGF. You will no longer receive any preferred returns or other payments from BSGF, because you will no longer be an investor in BSGF. You are also cautioned that the stock you are receiving contains substantial restrictions and conditions on when you can sell the stock, which are set forth in the document entitled Lock-Up Agreement attached as **Item 3** and which has also been placed in the BSGF data room under the heading of *Stock Redemption*. You should read this document carefully to fully understand the nature of

the payment of stock being made for Redemption Choice – B. In addition, you are urged to review the "Additional Q&A Information Schedule" that is attached as **Item 1**; click on the link provided in that schedule, and/or go to the website SEC.GOV, to read all of the public filings on the New York Stock Exchange Company whose stock you will be receiving. At the conclusion of this transaction, and after your stock has been transferred, you will no longer be an investor in BSGF.

## ADDITIONAL GENERAL INFORMATION

All prior risk factors in any and all documentation that you received from BSGF are incorporated herein by reference and, in addition, you grant Broadstreet, Inc. a power of attorney to execute any and all documents necessary on your behalf in order to accomplish the matters set forth herein.

Neither the United States Securities and Exchange Commission nor any State Securities Administrator has approved or disapproved this redemption notice.

We will no longer be open to any new outside investors. Thus, you will either be completely redeemed for cash as specified in Redemption Choice – A or you will participate in Redemption Choice – B and be completely redeemed for restricted stock as specified in Redemption Choice – B.

**Going forward, you will no longer be a member of BSGF, your capital accounts will be a zero and you will not receive any other payments or preferred distributions.**

Investors will have fourteen (14) days to select which redemption they are choosing. **Any investor not completing this document will be logged in BSGF's records as having chosen Redemption Choice – A for a cash buyout and will, as a result, receive that cash buyout.**

Below on the last page is a form for you to fill out to confirm your selection.

Thanking you again,

Broadstreet Global Fund, LLC

Kindly check the box below to reflect which choice you select.

( x ) Redemption Choice – A – payment in cash in an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.

( ) Redemption Choice – B – payment in restricted stock of three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.

Clients Name PAULA LYNN DARBY and Stephen Matthew Darby

Clients Account STEPHEN MATTHEW DARBY & PAULA LYNN DARBY

Signed Signed by: PAULA LYNN DARBY and Stephen Matthew Darby 5590256864DC403... Date 7/18/2025

211 N. Main Street, Greenville, SC 29601
https://broadstreetprivateequity.com

BROADSTREET GLOBAL

November 14, 2025

Dear Broadstreet Investor,

It has been a distinct honor to serve each and every one of you in the past few years, but as many of you know, Broadstreet has chosen to go in a new direction. Every private equity firm reaches a point where decisions have to be made regarding the future. Some funds, from inception, announce when the fund will cease to exist. Others operate looking for opportune exits and, at that point, the fund changes direction, often closing out investors and/or transforming to a family office type of operation.

We have chosen the latter. We will be pursuing our business on a private basis. As a result, we will be providing you two options to determine how you would like to exit from your investment. The first option, known as Option A, will be to simply have you redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.

The second option, which was completely voluntary on our part, and is being given to those who desire to participate in a new real estate enterprise with a new company, is known as Option B. Option B will be a public entity that is purchasing 21 of our infrastructure projects and will involve me personally. That option will allow you to receive stock valued at three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. That stock will have restrictions on trading or liquidating, which can be as long as 42 months (or possibly less, depending on the trading volume and pricing for the public entity). Option B will not entitle you to any quarterly, monthly, or annual distributions. Your Broadstreet investment will be traded for the stock in the public entity. That stock can increase over time or decrease. That option is different from anything previously provided in your original documents that you signed. It is an entirely new venture.

In addition, I want each and every one of you to know that I personally will be taking the overwhelming majority of my compensation in the form of stock in the public enterprise and I will be the largest individual shareholder in that entity. I will be responsible for the operation of the real estate division of that enterprise. I will also have restrictions on my ability to sell my stock. I will not be permitted to sell even a single share of stock for two years, regardless of the stock price or stock volume. Although I will not be the CEO of the public company, at nearly 60 years of age, I have other goals, primarily to increase my net worth and not caring much about my actual job title. Rest assured, I will be intimately involved in this new venture. The new company will be run by a group of much younger and highly educated persons from Wharton, Harvard and Cornell who have a new economy view of real estate and financial services. They have a skill set that I simply do not possess

to lead into this new world of decentralized finance, payments, stable coins and business transactions. My focus will be the real estate operations and I hope that the company, having a new economy aspect mixed with old economy assets, will allow for the type of investment valuation that an old world real estate company simply does not command in the market place.

Nonetheless, I will be the largest shareholder, I will actively advocate for that which I believe will serve me personally best, and that is the success of the stock and any further additional benefits that I will lobby for the stock to have.

Please read the attached redemption notice and its attachments carefully. Please also read the "Additional Q&A Information Schedule," which has additional questions and answers. What is best for me, may not be best for you and vice versa. The decision is solely yours to make. I have my own opinions, but they are just that, my opinions based on my goals, you need to make your own decision.

For those of you who have been along this journey, you know that I have closed every business meeting at Broadstreet with simply three letters: DBA, meaning Don't Be Average. I have preached this mantra throughout my entire career, and it has served me well. I look forward to continuing that journey in my latest endeavor. For those of you who exit at this point, it has been an honor and a pleasure. For those of you who continue on, I strive to never disappoint and to always exceed everyone's expectations.

Sincerely,

David Feingold

DBA!!!

---

This letter contains the opinions of David Feingold in his position as CEO of Broadstreet, Inc. This letter is not a solicitation, nor is it meant to express a support for either Option A or Option B. This letter is issued as part of the informational requirement of the subscription documents and operating agreement that you executed. No information shall be relied upon other than complying with such requirements as well as Mr. Feingold's freedom of speech and expression, each investor is urged to make their own independent decision and to employ any and all professionals that they may deem necessary to make any investment decision. This letter shall not be deemed investment advice. A copy has been provided to both the SEC and corporate monitor. The SEC takes no position on the adequacy of the Redemption Notice or the merits of the Proposed Redemption Transaction.

# BROADSTREET GLOBAL FUND REDEMPTION NOTICE

**PLEASE READ THIS NOTICE CAREFULLY. CONSULT COUNSEL IF NECESSARY. YOUR RIGHTS AS AN INVESTOR WILL BE SUBSTANTIALLY AFFECTED.**

**As an Investor in the Broadstreet Global Fund, LLC ("BSGF"), you are hereby advised of our redemption of your investment pursuant to Article VI of the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement") Item 1, including Sections 6.03 and 6.05, that each investor executed to become an investor with BSGF. This redemption is binding upon you whether you make an election or not; therefore, you should carefully read this notice and all information referenced in this notice.**

## REDEMPTION OVERVIEW

BSGF, as a private equity firm, focuses on multiple business opportunities, including the sale, transfer, trade and monetization of assets when opportunities present themselves. The developer associated with many of the BSGF projects, Contender Development, Inc., was presented with multiple opportunities for the purchase of some of our assets. In response, we retained professionals, including Builder Advisor Group, an investment bank specializing in mergers and acquisitions in the land development and housing sector and FINRA member that has participated in more than half of the largest homebuilder M&A transactions over the last ten years, and signed various non-disclosure agreements to evaluate the multiple sale opportunities (individually, a "Sale Opportunity," and collectively, the "Sale Opportunities").

Some of the Sale Opportunities will generate cash from the sale of individual infrastructure and land projects and another Sale Opportunity will create the payment of common stock of a New York Stock Exchange listed company that is restricted. By "restricted," we mean the stock you would be receiving has substantial restrictions on when it can be sold (restrictions could be for up to forty-two (42) months or less, depending on the price and trading volume of the stock). All restrictions are more specifically discussed in paragraph number 1 of the Lock-Up Agreement at sections (a) and (b). These restrictions are set forth in the Lock-Up Agreement attached as **Item 2**. All investors who elect to receive stock will be receiving a payment in stock at three times (3x) their capital account with shares being priced and issued at $10 per share.

For your redemption, you will be given two choices, and you must make a selection. Under one option (Redemption Choice – A), the investor would receive, in cash, the full value of their capital account. In order to determine the current amount of your capital account, please review your Juniper account statement under net equity balance. The second option (Redemption Choice – B) involves providing the investor with the payment of restricted (as defined above) common stock in a company named Soulpower Acquisition Corp. (NYSE symbol: Soul), which upon completion of the acquisition of various BSGF related real estate assets will change its name to SWB Holdings which will then merge into Soul with assets from BSGF and with approximately $250 million in cash. You will be paid in stock in an amount equal to three times (3x) your capital account balance. The basis of this valuation is derived from a valuation that was received placing the assets being sold at a valuation range of a low of $757 million to a high of $3.9 billion. The valuation

was negotiated at an arm's length basis with the buyer and priced at the high end of the range based on our agreement to accept stock with the restrictions described above. A copy of the valuation is attached as **Item 3**.

There will be no additional return paid. After this redemption, whether you choose choice A or B, you will no longer be an investor in BSGF, you will no longer receive preferred returns or other payments from BSGF, and there will be no additional amounts or returns paid to you by BSGF.

**REDEMPTION PROCESS**

This redemption process will be conducted exactly as specified in the Operating Agreement document, a copy of which is attached hereto as **Item 1** and also available in the BSGF data room under the tab Operating Agreement.

**REDEMPTION CHOICE – A**

For the first choice of redemption, known as "Redemption Choice – A," you will simply be redeemed for the cash value of your capital account. You will be redeemed pursuant to Sections 6.03 and 6.05 of the Operating Agreement. Pursuant to the Series Supplement, you will be paid within 180 days of your redemption election. At the conclusion of this transaction, and after your payment has been made, you will no longer be an investor in BSGF.

**REDEMPTION CHOICE – B**

For the second choice of redemption, known as "Redemption Choice – B," you will be paid with the payment of restricted common stock in a New York Stock Exchange listed company in an amount equal to three times (3x) your capital account balance. The basis for this valuation is derived from a valuation that was received placing the assets being sold for public stock at a valuation range of a low of $757 million to a high of $3.9 billion. The valuation was negotiated on an arm's length basis with the buyer and priced at the high end of the range based on our agreement to accept stock with the restrictions described above. There are no changes to any of your rights, terms or conditions as specified in the above-mentioned Operating Agreement, as you will no longer be an investor in BSGF. You are, however, cautioned that the stock you are receiving contains substantial restrictions and conditions on when you can sell the stock, which are set forth in a document entitled Lock-Up Agreement attached as **Item 2** and which has also been placed in the BSGF data room under the heading of *Stock Redemption*. You should read this document carefully to fully understand the nature of the payment of stock being made for Redemption Choice – B. In addition, you are urged to go to the website SEC.GOV and to read all of the public filings on the New York Stock Exchange Company whose stock you will be receiving. At the conclusion of this transaction, and after your stock has been transferred, you will no longer be an investor in BSGF.

**ADDITIONAL GENERAL INFORMATION**

All prior risk factors in any and all documentation that you received from BSGF are incorporated herein by reference and, in addition, you grant Broadstreet, Inc. a power of attorney

to execute any and all documents necessary on your behalf in order to accomplish the matters set forth herein.

Neither the United States Securities and Exchange Commission nor any State Securities Administrator has approved or disapproved this redemption notice.

We will no longer be open to any new outside investors. Thus, you will either be completely redeemed for cash as specified in Redemption Choice – A or you will participate in Redemption Choice – B and be completely redeemed for restricted stock as specified in Redemption Choice – B. Going forward, you will no longer be a member of BSGF, your capital accounts will be a zero and you will not receive any other payments or preferred distributions.

Investors will have fourteen (14) days to select which redemption they are choosing. **Any investor not completing this document will, at the discretion of the Manager of BSGF, be assumed to choose Redemption Choice – A for a cash buyout.**

Below on the last page is a form for you to fill out to confirm your selection.

Thanking you again,

Broadstreet Global Fund, LLC

Kindly check the box below to reflect which choice you select.

( x ) Redemption Choice – A – payment in cash in the amount of your capital account with no additional return on your investment.

( ) Redemption Choice – B – payment in restricted stock in an amount of three times (3x) your capital account

Clients Name Directed Trust Company FBO Stephen M Darby (IRA)

Clients Account DIRECTED TRUST COMPANY FBO STEPHEN M. DARBY (IRA)

Signed: Signed by: DIRECTED TRUST COMPANY FBO STEPHEN M. DARBY (IRA) E6E3F46FC6244C2... Date [illegible]

211 N. Main Street, Greenville, SC 29601
https://broadstreetprivateequity.com

# ITEM 1

BROADSTREET GLOBAL

**ADDITIONAL Q & A INFORMATION SCHEDULE**

Below are a number of questions and answers generated to provide additional information regarding the redemption:

1. Do the 21 projects have debt service, and if so, how much? **The 21 projects that are anticipated to be included with the public company (PUBCO) will operate in the same manner as the way in which Broadstreet operated its infrastructure projects. There was typically up to eighty percent debt placed on projects. That debt will remain on the projects after they are transferred to PUBCO and the operations of the projects is expected to cover that debt service.**

2. Will the purchasing entity assume that debt? **The purchasing entity will be taking over the special purpose vehicles ("SPV") that control the projects and those SPV's as a division of the parent PUBCO will assume the debt/guarantee the debt.**

3. Is any cash also being paid, and, if so, how much? **No, the PUBCO transaction is an all stock deal.**

4. Will the sale of the 21 projects happen regardless of which Option investors choose?**Yes.**

5. If, for example, $150 million in investors choose to redeem, what exactly is the plan to generate the monies needed to fund those redemptions? **We will not know for sure the extent of Broadstreet's redemption obligation until the complete redemption notice process is followed and completed. Nonetheless, we have a number of remaining assets available for sale, even excluding the 21 projects being sold to PUBCO, with indications that those assets are worth more than enough to cover all cash demanded. It would just require a sale of certain assets.**

6. I read that SWB Holdings will have $250 million in cash, but I have not been told if any of those funds are available to the monitorship entities to redeem investors. If so, how much? **The Asset Management Agreement provides us access to the cash which PUBCO will have for our operations. Nonetheless, we think our need to even access such capital is extremely remote based upon negotiations and offers that we have received on our assets that would be available for sale.**

7. Will Broadstreet's or BSI's (or Contender's) principals infuse capital, if necessary, to fund redemption obligations? **No, it will come from asset sales.**

8. Is third-party financing available or lined up to fund redemption obligations? **We have**

**been approached with a $500 million term sheet involving PUBCO stock to secure more funding if need be. At this point, the term sheet is under negotiation but again, we believe the value of our assets alone should suffice to meet any redemption requirement for cash.**

9. Will any assets be sold that are the subject of dispute in any litigation? **As a large enterprise, we are constantly in litigation or regulatory dispute. However, for the PUBCO transaction, none of our assets involving disputed litigation will be involved or sold to cover redemption requests.**

10. Have the managers of PUBCO been identified? **Yes, here is a link to a public filing made by PUBCO on or about January 24, 2025 that identifies the managers of PUBCO and includes some additional information about PUBCO that will assist you in understanding the company, its history, and its purpose:** sec.gov/Archives/edgar/data/2025608/000149315225003531/forms- 1.htm#sj_001

11. I assume David Feingold will be involved, because the LOI states that the "Seller" (Contender) will still manage the portfolio. What will his compensation be? **David Feingold will be involved as the largest individual stockholder. He is expected to hold 75 million shares of stock which he cannot gain access to until a two-year anniversary with the PUBCO. Feingold will also be responsible for the operation of the real estate division of that enterprise.**

12. Will Mr. Feingold's stock be restricted like the investors' stock? **Feingold will not be able to or allowed to sell a single share of stock until his two-year anniversary with the PUBCO. Broadstreet investors may or may not have an opportunity to exit before him depending on the price and volume of PUBCO stock. As explained in the Lock-Up Agreement, Broadstreet's shareholders "lock-up" period could be as high as 42 months, but it could be less depending on PUBCO's trading volume and stock price.**

13. Will Mr. Feingold receive any preferred stock? **No.**

14. Will Mr. Feingold be subject to an employment agreement? **No, but he will have an Asset Management Agreement which will allow him to earn monies based on incentives such as property closings and development.**

15. Will Mr. Feingold sign a non-compete with SWB Holdings? **No.**

16. If Broadstreet is keeping "70%" of the assets, will David Feingold also continue to have a role with Broadstreet? If so, how does he plan on simultaneously serving Broadstreet and PUBCO? Will Contender still serve as developer for Broadstreet's remaining assets? If so, how will Contender, with finite resources, serve as developer for two entities that are competing in the same market and the same region? I have

the similar questions for Joe Baldassarra and Steve Baldassarra, and Broadstreet's other "partners." **Broadstreet plans to sell its remaining assets and make distributions to its partners who have certain levels of ownership in the business. Feingold, the Baldassarras and the other partners will continue to maintain their roles with Broadstreet until such sale of assets is complete. Contender will act as developer for Broadstreet's remaining assets until they are sold. Contender and PUBCO will not be competing as Broadstreet will not be expanding its business. Broadstreet will merely complete its existing business. The Baldassarras and the other existing partners of Broadstreet will be passive shareholders in PUBCO but will not have any other role with PUBCO.**

**17. IF I DO NOT MAKE A SELECTION WHAT HAPPENS? UNFORTUNATELY IT HAS COME TO OUR ATTENTION THAT A NUMBER OF PERSONS BELIEVE THAT THEY CAN AVOID MAKING A SELECTION AND THEN WAIT TO SEE HOW THE STOCK TRADES AND THEN IF THE STOCK IS SUCCESSFUL, THEREAFTER CLAIM THAT THEY WANTED THE STOCK OR IN THE ALTERNATIVE CLAIM THEY NEVER SIGNED THE DOCUMENT AND THEREBY NEVER GAVE THEIR COMPLETE CONSENT. AS A RESULT, ANYONE RECEIVING THE REDEMPTION NOTICE WHO HAS NOT CONVEYED TO US A SELECTION WITHIN THE TIME LIMIT REQUIRED WILL BE KEPT ON OUR BOOKS AND RECORDS IN A SUSPENSE CATEGORY. AT THE POINT IN TIME THAT YOU EVENTUALLY ADVISE US IN WRITING OF YOUR SELECTION, IF THE PARTICULAR CHOICE YOU HAVE MADE IS NO LONGER AVAILABLE, THEN YOU WILL BE PLACED IN THE CHOICE WHICH IS AVAILABLE. IF NONE OF THE CHOICES ARE AVAILABLE, THEN IT SHALL BE THE SOLE DISCRETION OF THE MANAGER TO DETERMINE HOW TO PAY YOU, INCLUDING THE SALE OF ANY REMAINING ASSETS AND YOUR HAVING TO WAIT UNTIL THOSE ASSETS ARE SOLD AND PROCEEDS ARE RECEIVED. IN SHORT IF YOU DO NOT MAKE A SELECTION WITHIN THE DEADLINE, YOU ARE LEAVING THE ABSOLUTE DISCRETION TO THE MANAGER AS TO HOW TO PAY YOU AND WHAT TO PAY YOU AS PROVIDED IN THE BROADSTREET GLOBAL FUND PPM AND OPERATING AGREEMENT. YOU ALSO RISK RECEIVING LESS THAN YOU MAY HAVE EXPECTED.**

# ITEM 2

# AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# BROAD STREET GLOBAL FUND LLC

*A Delaware Series Limited Liability Company*

**Dated as of September 2023**

TABLE OF CONTENTS

Page

ARTICLE I INTERPRETATION .......... 1
Section 1.01 Definitions .......... 1
Section 1.02 Interpretation and Construction .......... 7
Section 1.03 Discretion; Good Faith .......... 8

ARTICLE II GENERAL PROVISIONS .......... 8
Section 2.01 Formation of the Company .......... 8
Section 2.02 Company Name and Address .......... 8
Section 2.03 Registered Agent and Registered Office .......... 8
Section 2.04 Fiscal Year .......... 8
Section 2.05 Purposes of the Company and Each Series .......... 8

ARTICLE III THE MEMBERS .......... 9
Section 3.01 Manager; Admission of New Members .......... 9
Section 3.02 Liability of the Members; Limited Liability of Each Series .......... 9
Section 3.03 Classes of Members .......... 10
Section 3.04 Meetings of Members; Voting Rights .......... 10

ARTICLE IV MANAGEMENT OF THE COMPANY AND EACH SERIES .......... 11
Section 4.01 General .......... 11
Section 4.02 No Participation in Management by Members .......... 13
Section 4.03 Reliance by Third Parties .......... 13
Section 4.04 Other Activities of the Manager .......... 13
Section 4.05 Exculpation .......... 13
Section 4.06 Indemnification .......... 14
Section 4.07 Management Fee .......... 15
Section 4.08 Expenses .......... 16
Section 4.09 Certain Affiliate Transactions .......... 17

ARTICLE V CAPITAL ACCOUNTS OF MEMBERS AND OPERATION THEREOF .......... 17
Section 5.01 Series .......... 17
Section 5.02 Capital Contributions .......... 19
Section 5.03 Capital Accounts .......... 20
Section 5.04 Company Percentages; Series Percentages .......... 20
Section 5.05 Allocation of Net Capital Appreciation or Net Capital Depreciation .......... 20
Section 5.06 Special Allocations .......... 21
Section 5.07 Amendment of Incentive Allocation. .......... 22
Section 5.08 Valuation of the Series' Assets .......... 22
Section 5.09 Liabilities .......... 22

Section 5.10 Goodwill ....................................................................................23
Section 5.11 Allocation for Tax Purposes ....................................................................23
Section 5.12 Determination by Manager of Certain Matters ................................................23
Section 5.13 Adjustments to Take Account of Certain Events .............................................23

ARTICLE VI WITHDRAWALS AND DISTRIBUTIONS OF CAPITAL ................................ 24
Section 6.01 Withdrawals and Distributions in General ....................................................24
Section 6.02 Withdrawals ....................................................................................24
Section 6.03 Required Withdrawals ............................................................................25
Section 6.04 Death, Disability, etc. of Members ............................................................25
Section 6.05 Distributions ..................................................................................25
Section 6.06 Effective Date of Withdrawal ...................................................................27
Section 6.07 Additional Limitations on Withdrawal of Capital Account .............................27
Section 6.08 Reserves; Adjustments for Certain Future Events ..........................................28

ARTICLE VII TRANSFERS OF INTEREST ........................................................................ 29
Section 7.01 Assignability of Interest .....................................................................29
Section 7.02 Substitute Member ..............................................................................29

ARTICLE VIII DURATION AND DISSOLUTION OF THE COMPANY AND ITS SERIES 30
Section 8.01 Term ............................................................................................30
Section 8.02 Dissolution ....................................................................................30
Section 8.03 Winding Up .....................................................................................31
Section 8.04 Time for Liquidation, etc ......................................................................32

ARTICLE IX TAX RETURNS; REPORTS TO MEMBERS; BOOKS AND RECORDS ......... 32
Section 9.01 Filing of Tax Returns ..........................................................................32
Section 9.02 Partnership Representative .....................................................................32
Section 9.03 Financial Statements ...........................................................................32
Section 9.04 Reports to Members .............................................................................33
Section 9.05 Member Information .............................................................................33
Section 9.06 Books and Records ..............................................................................33
Section 9.07 Withholding Tax ................................................................................33

ARTICLE X CONFIDENTIAL INFORMATION ........................................................................ 33
Section 10.01 Confidentiality ...............................................................................33
Section 10.02 Equitable and Injunctive Relief ..............................................................34

ARTICLE XI MISCELLANEOUS ........................................................................................ 34
Section 11.01 Entire Agreement ..............................................................................34
Section 11.02 Execution of Other Documents .................................................................34
Section 11.03 Power of Attorney .............................................................................34
Section 11.04 Amendments to Company Agreement .................................................................35
Section 11.05 Use of “Broad Street Global” Name .............................................................35
Section 11.06 Electronic Communications .....................................................................36
Section 11.07 Choice of Law .................................................................................36
Section 11.08 Severability ..................................................................................36

Section 11.09 Forum ....................................................................................................36
Section 11.10 Counterparts ...........................................................................................36
Section 11.11 Successors and Assigns ..........................................................................36
Section 11.12 No Waiver ...............................................................................................36
Section 11.13 Notices.....................................................................................................37
Section 11.14 Tax Elections...........................................................................................37
Section 11.15 No Third-Party Rights.............................................................................37
Section 11.16 Headings..................................................................................................37
Section 11.17 Counsel to the Company .........................................................................37
Section 11.18 Waiver of Partition..................................................................................38

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF

BROAD STREET GLOBAL FUND LLC

WHEREAS, the Company was formed on September 14, 2020 as a limited liability company pursuant to Delaware law upon filing of a certificate of formation with the office of the Secretary of State of the State of Delaware;

WHEREAS, the Company was previously governed by that certain Limited Liability Company Agreement dated as of September 14, 2020 (the "Original Agreement");

WHEREAS, pursuant to Section 11.04(iv) of the Original Agreement, the Manager desires to amend and restate the Original Agreement in its entirety to further clarify the creation of Series and use of Series Schedules;

NOW THEREFORE, in consideration of the mutual promises and obligations contained herein, the parties, intending to be legally bound hereby amend and restate the Original Agreement in its entirety as follows:

ARTICLE I

Interpretation

Section 1.01 Definitions. Unless otherwise expressly provided in this Agreement, the following terms used in this Agreement shall have the following meanings:

"Account Communications" shall have the meaning set forth in Section 11.06.

"Accounting Period" means the following periods: each Accounting Period shall commence immediately after the close of the immediately preceding Accounting Period. Each Accounting Period hereunder shall close at the close of business on the first to occur of (i) the last day of each month, (ii) the date immediately prior to the effective date of the admission of a new Member pursuant to Section 3.01, (iii) the date immediately prior to the effective date of an additional Capital Contribution from a Member pursuant to Section 5.02, (iv) the effective date of a Member's withdrawal of all or a portion of a Capital Account, (v) the date when the Company shall dissolve or a Series shall terminate, and (vi) any other date the Manager determines, in its sole discretion.

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, *et seq*., as amended from time to time.

"Administrator" means such Person or Persons appointed as administrator to the Company or any Series from time to time.

"Affiliate" means, with respect to any specified Person:

(a) any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person;

(b) any Person that serves as a director or officer (or in any similar capacity) of such specified Person; and

(c) any Person with respect to which such specified Person serves as a general partner, managing member or trustee (or in any similar capacity).

For purposes of this definition, "control" (including "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as it may be amended from time to time, including any and all current and future Series Schedules hereto. For the avoidance of doubt, any references herein to this "Agreement" shall be construed as references to this Agreement as amended and/or supplemented by the Series Schedules and shall include such Series Schedules.

"Authorized Representative" means, with respect to any Person, the directors, employees, legal advisers, accountants, fund administrators or custodians responsible for matters relating to the Company or any Series or any other Person approved in writing by the Manager.

"Beginning Value" means, with respect to any Series and Accounting Period, the Net Asset Value of such Series at the beginning of such Accounting Period after taking into account Capital Contributions made as of such date with respect to such Series).

| | |
|---|---|
| "<u>Business Day</u>" | means any day other than (a) Saturday and Sunday, and (b) any other day on which banks located in New York City are required or authorized by law to be closed. |
| "<u>Capital Account</u>" | means the capital account established for each Member on the books of a Series in accordance with the provisions of Section 5.03. |
| "<u>Capital Contribution</u>" | of a Member means a contribution by such Member with respect to a particular Series in cash, pursuant to the terms of this Agreement and the relevant Series Schedule. |
| "<u>Class</u>" | means any class of Interests in a Series as may from time to time be established by the Company. |
| "<u>Company</u>" | means Broad Street Global Fund LLC, a Delaware series limited liability company consisting of one or more Series formed, constituted and governed under and pursuant to the Act and this Agreement. |
| "<u>Company Counsel</u>" | means any firm or firms as the Manager may, in its sole discretion, select, at the expense of the Company, for the purpose of providing legal services to the Company. |
| "<u>Company Percentage</u>" | shall have the meaning set forth in Section 5.04(a). |
| "<u>Confidential Information</u>" | means all information concerning the business and affairs of the Company, a Series or the Affiliates of the Company that the Manager in its sole discretion reasonably believes to be in the nature of trade secrets or other information, the disclosure of which the Manager in its sole discretion believes is not in the best interests of the Company, any Series or the Affiliates of the Company, or could damage the Company, its Affiliates or their respective businesses or any Series, or which the Company, any Series or the Affiliates of the Company are required by law or agreement with a third party to keep confidential, including any information relating to the Company's or a Series' financial and investment strategy (*e.g.*, portfolio positions, trades and contemplated trades); all notices, letters and other communications whether written or oral between the Company or its Affiliates and any Member; the names and addresses of each of the Members and their initial and subsequent Capital Contributions. |
| "<u>Ending Value</u>" | means, with respect to any Series and Accounting Period, the Net Asset Value of such Series at the end of such Accounting |

| | |
|---|---|
| | Period (before giving effect to withdrawals occurring as of the Withdrawal Date with respect to such Series and any reduction for Investor Related Taxes related to such Series). |
| "Fiscal Year" | shall have the meaning set forth in Section 2.04. |
| "GAAP" | means U.S. generally accepted accounting principles, in effect from time to time. |
| "Incentive Allocation" | means an allocation to the Manager or its Affiliate of a portion of the profits or gains of a Series as set forth in the applicable Series Schedule. |
| "Indemnified Losses" | shall have the meaning set forth in Section 4.05(a). |
| "Indemnified Party" | means the Manager and its Affiliates, members, partners, directors, shareholders, officers, employees, agents and legal representatives (*e.g.*, executors, guardians and trustees) of any of them, including Persons formerly serving in such capacities. |
| "Initial Capital Contribution" | shall have the meaning set forth in Section 5.02(a). |
| "Interests" | means the entire ownership interest of a Member with respect to any Series in the Company, subject to the rights and obligations of such Member pursuant to this Agreement, the relevant Series Schedule and the Act. |
| "Internal Revenue Code" | means the Internal Revenue Code of 1986, as amended. |
| "Investment" | means any note, stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, financial futures contract, commodity futures contract, put or call option, voting-trust certificate, certificate of deposit for a security, or, in general, any interest or instrument commonly known as a "security" or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. |
| "Investor Related Taxes" | means taxes imposed under Sections 1471-1474 of the Internal Revenue Code, or other similar laws, resulting from the status, action or inaction of a Member. |

| | |
|---|---|
| "Judicially Determined" | means found by a court of competent jurisdiction upon entry of a final judgment rendered and unappealable or not timely appealed. |
| "Lock-Up Period" | means, with respect to a Series, the lock-up period, if any, set forth in the applicable Series Schedule. |
| "Majority-in-Interest" | of the Members means, as of any date of determination, Members that are entitled to vote on a matter and have in excess of 50% of the Company Percentages or Series Percentages (as applicable) of the Members that are entitled to vote on such matter. |
| "Management Fee" | shall have the meaning set forth in Section 4.07(a). |
| "Manager" | means Broad Street Global Management LLC, a limited liability company formed under the laws of the State of South Carolina, in its capacity as the manager of the Company and each Series, and any additional or successor manager, each in its capacity as a manager of the Company and each Series. |
| "Member" | means any Person admitted to a Series as a Member of such Series pursuant to the provisions of this Agreement and the relevant Series Schedule that is named as a member of the Series in the books and records of the Series, including any Persons hereafter admitted as Members, so long as each such Person remains a Member in accordance with the terms of this Agreement, the relevant Series Schedule and the Act and excluding any Persons who cease to be Members in accordance with this Agreement and the relevant Series Schedule. |
| "Memorandum Account" | shall have the meaning set forth in Section 5.05(c). |
| "Net Asset Value" | means the excess of the value of the Company's or a Series' assets over the value of its liabilities as determined in accordance with this Agreement. |
| "Net Capital Appreciation" | means, with respect to any Accounting Period, the excess, if any, of the Ending Value over the Beginning Value of a particular Series. |
| "Net Capital Depreciation" | means, with respect to any Accounting Period, the excess, if any, of the Beginning Value over the Ending Value of a particular Series. |

| | |
|---|---|
| "New Issue" | means a "new issue" as defined in FINRA Rule 5130. |
| "Notice Period" | shall have the meaning set forth in Section 6.08(c). |
| "Original Agreement" | shall have the meaning set forth in the recitals hereto. |
| "Other Accounts" | means other accounts to which the Manager or any of its Affiliates provides investment services. |
| "Person" | means a natural person, partnership, limited liability company, corporation, unincorporated association, joint venture, trust, state or any other entity or any governmental agency or political subdivision thereof. |
| "Proceedings" | means claims, demands, actions, suits or proceedings (civil, criminal, administrative or investigative, which includes formal and informal inquiries and "sweep" examinations in connection with a Series' investment activity), actual or threatened. |
| "Purchase Price" | shall have the meaning set forth in Section 5.05(c). |
| "Series" | shall have the meaning set forth in Section 5.01(a). |
| "Series Percentage" | shall have the meaning set forth in Section 5.04(b). |
| "Series Schedule" | means each schedule to this Agreement that covers terms specific to a particular Series or Class within a Series, each of which shall be a part of this Agreement. A Series Schedule may amend, supplement and/or supersede any provision of this Agreement (including provisions relating to contributions, withdrawals, Management Fees, the Incentive Allocation and distributions). To the extent that any term of a Series Schedule conflicts with this Agreement, the Series Schedule shall govern, solely with respect to the applicable Series or Class. In lieu of a standalone Series Schedule, the provisions that would otherwise be included on a Series Schedule may instead be included within materials posted on a website or electronic data room of the Company and each Member will be bound by the terms included in all posted materials for the relevant Series or Class as if set forth on a standalone Series Schedule. |
| "Subscription Date" | means, with respect to a Series, the day or days on which Members may make Initial Capital Contributions and additional Capital Contributions to such Series, as set forth in the Series Schedule relating to such Series. |

"Substitute Member" means a Transferee of an Interest who is admitted to all of the rights of a Member with respect to the Interest transferred or assigned to it pursuant to Section 7.01.

"Transfer" means any transaction by which a Member may directly, indirectly or synthetically transfer, pledge, assign, hypothecate, sell, convey, exchange, reference under a derivatives contract or any other arrangement or otherwise dispose of all or any portion of its Interest to any other beneficial owner or other Persons.

"Transferee" means any Person to which an Interest is transferred in accordance with Section 7.01.

"Transferor" means any Person that makes a Transfer of its Interest in accordance with Section 7.01.

"Unrestricted Member" shall have the meaning set forth in Section 5.05(b).

"Valuation Date" shall have the meaning set forth in Section 5.08(a).

"Valuation Policy" shall have the meaning set forth in Section 5.08(a).

"Withdrawal Date" shall have the meaning set forth in Section 6.02.

Section 1.02 Interpretation and Construction.

(a) In this Agreement, unless a clear contrary intention appears:

(i) common nouns and pronouns and any variation thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person, Persons or other reference in the context requires;

(ii) where specific language is used to clarify by example a general statement contained in this Agreement, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates;

(iii) "any" shall mean "one or more";

(iv) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; and

(v) all references to "funds", "dollars" or "payments" shall mean United States dollars.

(b) The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of construction or interpretation requiring this Agreement to be construed or interpreted against any party shall apply.

(c) Unless otherwise specified in this Agreement, all accounting terms used in this Agreement shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP.

Section 1.03 Discretion; Good Faith. Whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "discretion", "sole discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider such interests and factors as it desires, including its own interests, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard, shall not be subject to any other or different standard generally imposed by applicable law to the extent waiveable and may exercise its discretion differently with respect to different Members, *provided* that, in making any such decision described in clauses (i) and (ii) above, the Manager shall act consistent with its fiduciary duties to the Members.

ARTICLE II

General Provisions

Section 2.01 Formation of the Company. The Company was formed as a series limited liability company in compliance with Section 18-215 of the Act, by the filing of the Certificate of Formation of the Company with the Office of the Secretary of State of the State of Delaware on September 14, 2020. Such action is hereby ratified and confirmed in all respects. The Company shall have one or more Series of Interests, and each Series shall be established as provided in Section 5.01.

Section 2.02 Company Name and Address. The name of the Company is "Broad Street Global Fund LLC". The principal office of the Company is located at such location as the Manager may designate from time to time. The Manager shall promptly notify the Members of any change in the Company's address.

Section 2.03 Registered Agent and Registered Office. The registered agent for the Company and the address of the registered office of the Company in the State of Delaware is as provided in the Certificate of Formation of the Company.

Section 2.04 Fiscal Year. The fiscal year of the Company and each Series (the "Fiscal Year") shall end on December 31 of each year unless another date is required under the Internal Revenue Code for federal income tax purposes.

Section 2.05 Purposes of the Company and Each Series. The Company and each Series are organized for the following purposes and objectives:

(a) to achieve investment returns by investing and reinvesting each Series' assets in such Investments as described in the applicable Series Schedule; and

(b) to the extent necessary or, in the sole discretion of the Manager, desirable or prudent to achieve the objective set forth in Section 2.05(a) above, by acquiring, holding, selling, exchanging, and otherwise investing in and disposing of directly or indirectly, Investments; engaging in any other lawful transaction in Investments as the Manager may determine from time to time, including borrowing funds in connection with acquiring or holding Investments, pledging or hypothecating Investments, and lending Investments; and exercising all rights, powers, privileges, and other incidents of ownership of such Investments, including, without limitation, voting rights attaching thereto. To this end, the Company and any Series may engage in any activity or transaction that may, in the Manager's discretion, be necessary, suitable or proper to accomplish or further such objective, and do any and all other acts incidental to, arising from or connected with such purposes. In addition, the Company and each Series may engage in any other activity permitted to limited liability companies organized under the Act.

## ARTICLE III

## The Members

Section 3.01 Manager; Admission of New Members.

(a) The current manager of the Company is Broad Street Global Management LLC, a South Carolina limited liability company. Upon written notice to Members, the Manager may appoint a new or additional manager of the Company or any Series or directly or indirectly transfer, assign, sell, or otherwise convey its interest as manager of the Company or any Series to any other party (whether or not such party is an Affiliate of the Manager). The Manager may withdraw as manager of the Company upon written notice to the Members so long as there is at least one remaining manager of the Company and each Series. The Members acknowledge that no Member shall have the right to vote or consent to such change in manager.

(b) Subject to the condition that each new Member shall execute this Agreement or other appropriate instrument pursuant to which it agrees to be bound by the terms and provisions of this Agreement and the relevant Series Schedule, the Manager may admit one or more new Members to a Series as of any Subscription Date specified in the applicable Series Schedule, subject to the sole discretion of the Manager to admit such Members at any time.

(c) The Members of each Series shall be set forth in the books and records of such Series.

(d) Admission of a new Member shall not be a cause for dissolution of the Company or the termination of a Series. A Series shall only be terminated as set forth herein and in accordance with the Act.

Section 3.02 Liability of the Members; Limited Liability of Each Series.

(a) Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company or a Series, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company or such Series, as applicable, and not any other Series, and none of the Members shall be obligated personally for any such debt, obligation or liability of the Company or a Series solely by reason of being a Member of the Company or such Series; *provided*, *however*, that a Member shall be required to contribute to the Company and the Series in which it participates any amounts required under the Act or pursuant to Section 6.05(d)(ii) and pursuant to the applicable Series Schedule.

(b) Neither the Manager nor any of its Affiliates (other than the Company or the relevant Series) shall be liable for the return of the Capital Contributions of any Member, and each Member hereby waives any and all claims that it may have against the Manager or any Affiliate thereof (other than the Company, any other Member and any Series in which it holds or held an Interest) in this regard.

(c) Pursuant to Section 18-215 of the Act, the debts, liabilities, obligations, and expenses of each Series shall be enforceable against the assets of such Series only, and not against the Company generally or against any other Series of the Company, whether currently existing or established subsequent to the date of this Agreement. Except as otherwise provided in Section 4.08 of this Agreement and under the Act, none of the debts, liabilities, obligations, or expenses incurred, contracted for, or otherwise existing with respect to the Company generally shall be enforceable against the assets of any particular Series.

Section 3.03 Classes of Members. The Company, in the Manager's sole discretion, may establish Classes within each Series, each of which having different terms, including, for example, different Management Fees, Incentive Allocation and withdrawal rights. New Classes may be established by the Manager without providing any notice to, or receiving consent from, existing Members. The terms of such Classes will be determined by the Manager in its sole discretion.

Section 3.04 Meetings of Members; Voting Rights.

(a) The Manager may call meetings of the Members from time to time in its sole discretion. Meetings of Members may be called solely by the Manager for any purpose. Meetings of Members may be held at such time and place, within or without the State of Delaware, as shall be stated in the notice of the meeting.

(b) Except as otherwise provided herein, Members entitled to vote in accordance with the terms hereof shall be entitled to vote in accordance with their Company or Series Percentages, as applicable. All matters put to a vote of the Members shall be decided by a Majority-in-Interest, except as otherwise provided herein. The Members shall have no right to vote on any matter except as expressly set forth in this Agreement and/or any applicable Series Schedule.

(c) The presence, in person or by proxy, of a Majority-in-Interest, shall constitute a quorum at all meetings of the Members. In case a quorum shall not be present at any meeting, Members holding Interests representing a majority of Company or Series Percentages, as applicable, present, in person or by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until Members holding the requisite percentage shall be present.

(d) Written notice, stating the place, date and time of the meeting, and the general nature of the business to be considered, shall be given to each Member at its address as it appears on the records of the Fund, not less than five (5) days before the date of the meeting. No business other than that stated in the notice shall be transacted at any meeting without the unanimous consent of all the Members entitled to vote thereat.

(e) Any action required to be taken at any meeting of Members, or any action which may be taken at any meeting, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by Members holding Interests representing the requisite number of Company or Series Percentages, as applicable, necessary to authorize or take such action at a meeting at which all Investors holding all Company or Series Percentages, as applicable, were present and voted. Prompt notice of the taking of the action without a meeting by less than unanimous written consent shall be given to those Members who have not consented in writing.

## ARTICLE IV

### Management of the Company and Each Series

Section 4.01 General. The management of the Company and each Series shall be vested exclusively in the Manager. The Manager shall have the authority, on behalf of and in the name of the Company or each Series, to take any action or make any decisions on behalf of the Company and each Series hereunder, to carry out any and all of the purposes of the Company and each Series set forth in Section 2.05, and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental thereto, including to:

(a) take any and all action that is permitted under the Act and that is customary or reasonably related to the business of the Company or any Series;

(b) invest within or outside the United States in Investments and any publicly traded, private or restricted common and preferred stock, other evidences of equity ownership, debt investments of any credit quality or seniority including, without limitation, defaulted debt investments, secured and unsecured debt investments, or any options or investments convertible into or exercisable for any of the foregoing, and fixed-income investments (including obligations of the United States, any other government or international agency or instrumentalities and agencies of any of them);

(c) acquire, hold, sell, transfer, exchange and dispose of Investments, and exercise all rights, powers, privileges and other incidents of ownership and possession

with respect to such Investments, including, without limitation, the voting of Investments, the approval of restructuring of entities in connection with Investments, participation in arrangements with creditors of entities in connection with Investments, the institution and settlement or compromise of suits and administrative proceedings and other similar matters;

(d) write, purchase, hold, sell and otherwise deal in put and call options of any sort and in any combination thereof;

(e) purchase, hold, sell and otherwise deal in commodities, commodity contracts, commodity futures, commodity interests, financial futures and options in respect thereof;

(f) purchase, hold, sell and otherwise deal in currencies, forwards, swaps, partnership interests, interests in investment companies and any other financial instruments that exist now or are hereafter created;

(g) open, maintain and close bank accounts and draw checks or other orders for the payment of money and open, maintain and close brokerage, mutual fund and similar accounts, including futures accounts;

(h) conduct margin accounts with brokers;

(i) cause a Series to borrow monies from time to time (and to pledge, mortgage, hypothecate or encumber its assets, and issue notes or other evidences of indebtedness, in connection herewith), on such terms and subject to such conditions as the Manager may determine;

(j) repay borrowings under any credit agreement or similar arrangement entered into by a Series which are otherwise authorized by this Agreement;

(k) engage and terminate consultants, attorneys, accountants and such other agents and employees for itself and for the Company or any Series as it may deem necessary or advisable, and authorize any such agent or employee to act for and on behalf of the Company or such Series;

(l) enter into, make and perform any contracts, agreements or other undertakings it may deem advisable in conducting the business of the Company or any Series, including but not limited to contracts, agreements or other undertakings with Persons with whom the Manager or any other Member is affiliated;

(m) retain one or more Persons or entities, including Affiliates of the Manager, as investment adviser, investment manager or sub-manager to supervise the investment of assets of a Series and to enter into an agreement with such investment adviser, investment manager or sub-manager providing for the payment of fees to such person;

(n) appoint such agents of the Company or any Series as it deems necessary to hold such offices, exercise such powers and perform such duties as it shall determine from time to time;

(o) incur and pay, subject to reimbursement by the Company or applicable Series unless otherwise agreed by the Manager, and consistent with the terms, provisions and limitations relating to such fees and expenses in this Agreement, either on a current basis or subject to amortization over such period as the Manager may reasonably determine to be appropriate, any charges, taxes, liabilities and expenses which are necessary or incidental to, or in support of, the carrying out of any of the purposes of this Agreement; and

(p) act for the Company and each Series in all other matters.

The Manager may delegate any or all of its authority to another party provided that the Manager remains responsible for its obligations under this Agreement.

Section 4.02 No Participation in Management by Members. Except as authorized by the Manager, the Members, in their capacities as such, shall not take part in the management or control of the Company or any Series, transact any business in the Company's name or on behalf of a Series or have the power to sign documents for or otherwise bind the Company or any Series.

Section 4.03 Reliance by Third Parties. Persons dealing with the Company or any Series are entitled to rely conclusively upon the certificate of the Manager, to the effect that it is then acting as the Manager, and upon the authority of the Manager as set forth in this Agreement.

Section 4.04 Other Activities of the Manager. The Manager and its Affiliates shall devote so much of their time to the affairs of the Company or any Series as in the judgment of the Manager the conduct of its business shall reasonably require, and neither the Manager nor its Affiliates shall be obligated to do or perform any act or thing in connection with the business of the Company or any Series not expressly set forth in this Agreement. Nothing contained in this Section 4.04 shall be deemed to preclude the Manager or its Affiliates from exercising investment responsibility, from engaging directly or indirectly in any other business or from directly or indirectly purchasing, selling, holding or otherwise dealing with any assets for the account of any such other business, for their own accounts, for any of their family members or for Other Accounts. No Member shall, by reason of being a Member of the Company, have any right to participate in any manner in any profits or income earned, derived by or accruing to the Manager or any Affiliate from the conduct of any business other than the business of the Company (to the extent provided in this Agreement) or from any transaction effected by the Manager or such Affiliate for any account other than that of the Company or its Series, except as may otherwise be agreed in writing.

Section 4.05 Exculpation.

(a) No Indemnified Party shall be liable to any Member, the Company or any Series for any costs, losses, claims, damages, liabilities, expenses (including reasonable legal and other professional fees and disbursements), judgments, fines or settlements (collectively, "Indemnified Losses") arising out of, related to or in connection

with any act or omission of such Indemnified Party taken, or omitted to be taken, in connection with the Company, any Series or this Agreement, except for any Indemnified Losses that are Judicially Determined to be solely attributable to the bad faith, gross negligence, willful misconduct or fraud of such Indemnified Party. In addition, no Indemnified Party shall be liable to any Member, any Series or the Company for any Indemnified Losses arising out of, related to or in connection with any act or omission taken, or omitted to be taken, by any broker or agent of a Series or the Company if such broker or agent was selected by such Indemnified Party directly or on behalf of such Series or Company in accordance with the standard of care set forth above. Any Indemnified Party may consult with counsel, accountants, investment bankers, financial advisers, appraisers and other specialized, reputable, professional consultants in respect of affairs of the Series or the Company and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such Persons; *provided* that such Persons shall have been selected in accordance with the standard of care set forth above.

(b) Notwithstanding any of the foregoing to the contrary, the provisions of this Section 4.05 shall not be construed so as to provide for the exculpation of any Indemnified Party for any liability (including liability under federal securities laws which, under certain circumstances, impose liability even on Persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section 4.05 to the fullest extent permitted by law.

Section 4.06 Indemnification.

(a) To the fullest extent permitted by law, the Company or a Series (as applicable) shall indemnify and hold harmless each Indemnified Party from and against any and all Indemnified Losses suffered or sustained by such Indemnified Party by reason of any act, omission or alleged act or omission arising out of, related to or in connection with the Company, such Series or this Agreement, or any and all Proceedings in which an Indemnified Party may be involved, as a party or otherwise, arising out of, related to or in connection with such Indemnified Party's service to or on behalf of, or management of the affairs or assets of, the Company or such Series, or which relate to the Company or such Series, except for any Indemnified Losses that are Judicially Determined to be solely attributable to the bad faith, gross negligence, willful misconduct or fraud of such Indemnified Party. The Company or a Series (as applicable) shall also indemnify and hold harmless each Indemnified Party from and against any and all Indemnified Losses suffered or sustained by such Indemnified Party by reason of any acts, omissions or alleged acts or omissions of any broker or agent of the Company or such Series; *provided* that such broker or agent was selected, engaged or retained by such Indemnified Party directly or on behalf of the Company or such Series in accordance with the standard of care set forth above. The termination of a Proceeding by settlement or upon a plea of *nolo contendere*, or its equivalent, shall not, of itself, create a presumption that such Indemnified Party's acts, omissions or alleged acts or omissions were solely attributable to the bad faith, gross negligence, willful misconduct or fraud of such Indemnified Party. Expenses (including legal and other professional fees and disbursements) incurred in any Proceeding may, with

the consent of the Manager, be paid by the Company or a Series (as applicable) in advance of the final disposition of such Proceeding upon receipt of an undertaking by or on behalf of such Indemnified Party to repay such amount if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified by the Company or such Series as authorized hereunder.

(b) Notwithstanding any of the foregoing to the contrary, the provisions of this Section 4.06 shall not be construed so as to provide for the indemnification of any Indemnified Party for any liability (including liability under the federal securities laws which, under certain circumstances, impose liability even on Persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 4.06 to the fullest extent permitted by law.

(c) Each Indemnified Loss shall be the liability solely of the Series to which such Indemnified Loss is attributable, and shall not be the liability of any other Series. Liability for Indemnified Losses that are attributable to the Company generally, and not specifically attributable to one or more Series, shall be apportioned among the Series in a manner that the Manager, in its sole discretion, determines is fair and equitable.

Section 4.07 Management Fee.

(a) As set forth in the applicable Series Schedule, each Series may pay to the Manager a fee for management and administrative services (the "Management Fee") for such periods and in such amounts as is set forth in the Series Schedule for such Series and if applicable, for each Class within such Series. The Management Fee shall be calculated and accrued as described in the applicable Series Schedule. Except as otherwise provided in the applicable Series Schedule, the Management Fee shall be calculated and paid in arrears.

(b) Except as otherwise provided in the applicable Series Schedule, (i) the Management Fee shall be prorated for any Capital Contribution by a Member that is effective other than as of the first day of a calculation period and (ii) in the event of a withdrawal by a Member other than as of the last day of a calculation period, the Manager shall pay to the applicable Series an amount equal to the *pro rata* portion of the Management Fee, based on the actual number of days remaining in such calculation period, and such Series shall distribute such amount to the withdrawing Member. In the sole discretion of the Manager, Management Fees may be waived, reduced, rebated or calculated differently with respect to certain Members and with respect to different Series or Classes owned by the same Member.

(c) In consideration for the Management Fee, the Manager will provide office space and utilities; certain administrative services; and secretarial, clerical and other personnel to the Company. The Manager shall bear the costs of providing such goods and services, and all of its own overhead costs and expenses, except to the extent such goods, services, costs and expenses are provided for through soft dollars generated by the Company or a Series as permitted hereunder.

Section 4.08 Expenses.

(a) The Company shall bear all of the costs of operating and administering its affairs, including, without limitation: legal and other expenses incurred in the formation of the Company and each Series and the offering of the Interests; brokerage commissions; custodial fees; fees and reimbursable expenses of the Administrator; expenses incurred by the Manager that are directly related to the Company's investment activities, communication and printing expenses of the Manager and its Affiliates in connection with Company activities (including marketing materials); transfer and other taxes; the costs of insurance premiums; legal and bookkeeping costs; auditing; accounting and tax preparation fees and expenses; interest on margin and other borrowings, including on credit facilities obtained to provide funding for withdrawals; borrowing charges on investments sold short; filing fees; costs of Member reporting; costs of Company governance activities (such as obtaining Member consents if and when necessary or appropriate); fees of any additional investment manager or investment adviser appointed for one or more Series; and all other costs and expenses related to the management and operation of the Company and/or the purchase, sale or transmittal of Company assets and distribution of the Interests (such as costs associated with services that may be used to access certain distribution platforms and the costs associated with such platforms), as well as a Series' *pro rata* share of costs and expenses of the Investment(s) in which such Series invests, all as the Manager determines in its sole discretion. In general, each Series will be responsible for a *pro rata* portion of the Company's expenses as set forth above. Notwithstanding the foregoing, to the extent any Company expenses do not relate to all Series, such expenses will be shared *pro rata* among the Series to which such expenses relate as determined in the discretion of the Manager. A Series Schedule may provide additional expenses that will be borne by the Fund.

(b) The Manager shall allocate among each Series, and each Series shall bear, such proportion of the expenses of the Company as the Manager, in its sole discretion, determines to be fair and equitable. For the avoidance of doubt, no Series shall be liable for expenses incurred by, or properly attributable to, another Series, as determined by the Manager in its sole discretion. The expenses attributable or allocated to a Series shall (other than Investor Related Taxes) generally be borne by the Members participating in such Series *pro rata* in accordance with each Member's relevant Series Percentage; *provided* that the Manager may, in its sole discretion, determine the allocation of any expenses among the Members participating in a Series in any other manner that the Manager determines is fair and equitable to all Members of such Series. To the extent that expenses to be borne by the Company and/or any Series, as applicable, are paid by the Manager and/or to the extent the Manager incurs expenses of the nature described above in the performance of its duties to the Company and/or any Series, the Company and/or the applicable Series shall reimburse the Manager for such expenses.

(c) If any of the expenses listed in Section 4.08(a) are incurred for the account of the Company or a Series (as applicable) as well as any Other Accounts, such expenses shall be allocated among the Company or the Series (as applicable) and such

Other Accounts in proportion to the size of the investment made by each to which such expense relates, or in such other manner as the Manager considers fair and equitable.

Section 4.09 Certain Affiliate Transactions. The Manager and its Affiliates may purchase an investment that would otherwise be appropriate for the Fund or a Series to own. The Manager and its affiliates may then sell such an investment to the Fund at a value determined by an independent third party. The Members acknowledge and agree that the Manager and its Affiliates may undertake such transactions without the consent of any Member to the particular transaction.

ARTICLE V

Capital Accounts of Members
and Operation Thereof

Section 5.01 Series.

(a) In accordance with Section 18-215 of the Act, the Manager, without the consent of or notice to any other Member, may create one or more series of Interests (each, a "Series"), the Interests in each of which shall be separate and distinct from the Interests in any other Series, by adopting a Series Schedule for each such Series (which shall include the Manager posting a Series Schedule on a website or electronic dataroom), which Series Schedule shall be treated as a part of this Agreement. Unless otherwise determined by the Manager in its sole discretion, each Series Schedule shall be maintained by the Manager on a confidential basis and shall be provided only to those Members who are Members of the applicable Series or Class and such other persons approved by the Manager in its sole discretion. Such Series Schedule may provide for Series with additional and/or different rights (including, without limitation, with respect to portfolios, use of leverage, minimum and additional subscription amounts, notice requirements, withdrawal rights, Management Fees, Incentive Allocation, information rights, transfers, notices and transparency and other rights) than other Series. In general, each Series shall have a differentiated investment strategy from each other Series. In general, the Company will not be required to notify any or all of the other Members in a Series of any such Series Schedule or any of the rights and/or terms or provisions thereof, nor will the Company be required to offer such additional and/or different rights and/or terms to any or all of the other Series.

(b) The establishment and designation of any Series shall be effective upon the effective date of the Series Schedule (which shall be the date such Series Schedule is posted to a website or electronic dataroom with respect to such Series Schedules). Separate Classes may be established within each Series, and each such Class shall be established for the purpose of varying the fees payable by different Members in a Series, the purpose of targeting different investments or for such other purposes as may be determined by the Manager in its discretion. In connection with the establishment of a Series hereunder, the Manager may, in its sole discretion and without the consent of or notice to any other Members, issue Interests in any Series thereof without limitation for such amount and type of consideration, at such time or times and on such terms as the

Manager may deem appropriate. The terms of any Series established by the Manager shall be as set forth in the Series Schedule relating thereto, and to the extent not inconsistent therewith, as otherwise set forth herein.

(c) In connection with the creation of each Series and except as otherwise expressly provided in the Act, the Company shall establish and maintain separate and distinct records for such Series, and shall cause the assets, debts, liabilities, obligations, expenses, profits and losses associated with any such Series to be accounted for separately from the other assets, debts, liabilities, obligations, expenses, profits and losses of the Company, if any, and each other Series.

(d) All provisions herein relating to the Company shall apply equally to each Series of the Company, except as the context otherwise requires.

(e) The following provisions shall be applicable to existing Series and each further Series that may from time to time be established and designated by the Manager:

(i) All consideration received by the Company for the issue or sale of Interests in a particular Series, and all other property in which such consideration is invested or reinvested, all income, earnings, profits, and proceeds thereof, including any proceeds derived from the sale, exchange or liquidation of such assets, and any funds or payments derived from any reinvestment of such proceeds in whatever form the same may be, shall irrevocably belong to that Series for all purposes, subject only to the rights of creditors of such Series and except as may otherwise be required by applicable law, and shall be so recorded upon the books and records of the Company.

(ii) The property belonging to each particular Series shall be charged with the liabilities of the Company with respect to a Series and all losses, debts, obligations, liabilities, expenses, whether arising in contract, tort or otherwise existing, and reserves attributable to such Series. In the event that there is such property, losses, debts, obligations, liabilities, expenses, or any income, earnings, profits, and proceeds thereof, funds, or payments which are not readily identifiable as belonging to any particular Series, the Manager shall allocate them among any one or more of the Series established and designated, from time to time, in such manner and on such basis as the Manager, in its sole discretion, deems fair and equitable. Each such allocation by the Manager shall be conclusive and binding upon the Members for all purposes.

(f) Without limitation of the foregoing provisions of this Section 5.01, except as may be otherwise expressly provided in the Act, and subject to the right of the Manager in its sole discretion to allocate general liabilities, expenses, costs, charges or reserves as herein provided, the losses, debts, liabilities, obligations and expenses, including any obligations under Section 4.06, whether arising in contract, tort or otherwise existing, with respect to a particular Series shall be enforceable against such Series only, and not against any other Series or the Company generally; and none of the losses, debts,

liabilities, obligations and expenses, whether arising in contract, tort or otherwise existing, with respect to the Company generally or any other Series, shall be enforceable against such Series. Notice of this limitation on liabilities of each Series shall be set forth in the Certificate of Formation of the Company (whether originally or by amendment) as filed or to be filed in the Office of the Secretary of State of the State of Delaware pursuant to the Act, and upon the giving of such notice in the Certificate of Formation, the statutory provisions of Section 18-215(b) of the Act relating to limitations on the liabilities of each Series (and the statutory effect under Section 18-215(b) of the Act setting forth such notice in the Certificate of Formation) shall become applicable to the Company and each Series. The Manager shall seek to cause every note, bond, contract or other undertaking issued by or on behalf of a particular Series to include a recitation limiting the obligation represented thereby to that Series, *provided*, that the failure to include such a recitation in any note, bond, contract or other undertaking shall not affect the limitation on liabilities of any Series.

(g) Notwithstanding any other provision of this Agreement, no distribution (including, without limitation, any distribution made upon the dissolution, liquidation or termination of the Company or the termination of any Series) with respect to, nor any redemption or repurchase of, the Interests of any Series shall be effected by the Company other than from the assets held with respect to such Series, nor shall any Member of any particular Series otherwise have any right or claim against the assets held with respect to any other Series (except to the extent that such Member has such a right or claim hereunder as a consequence of holding Interests of such other Series). A holder of Interests in a particular Series shall not be entitled to participate in a derivative or class action lawsuit brought on behalf of any other Series or the holders of Interests in any other Series.

(h) The Manager may at any time, terminate any Series, and the establishment and designation thereof, pursuant to Article VIII and, upon such a termination, the Series Schedule relating to such Series shall be deleted as a schedule to this Agreement.

Section 5.02 Capital Contributions.

(a) Each Member has paid or conveyed by way of contribution to a Series cash having an aggregate value as set forth in the relevant books and records of such Series (the "Initial Capital Contribution"). Additional Capital Contributions with respect to a particular Series may be made by Members only in accordance with the provisions of this Section 5.02.

(b) With the prior approval of the Manager, a Member may make additional Capital Contributions to any Series in cash at such time as the Manager may permit.

(c) The Capital Contribution of the Manager, if any, shall be set forth on the books and records of the Company with respect to each Series in which the Manager acquires an Interest. The Manager shall have the right to make a Capital Contribution (in such amount as determined by the Manager in its sole discretion) to, and acquire an Interest

in, each Series, but the Manager shall be under no obligation to make a Capital Contribution to a Series.

Section 5.03 Capital Accounts. A separate Capital Account shall be established on the books of the Company and the applicable Series for each Member with respect to each Series to which such Member has made a Capital Contribution. Each Member's Capital Account shall be maintained and adjusted in accordance with Sections 1.704-1(b)(2)(iv) and 1.704-2 of the Treasury Regulations and the provisions of this Agreement related to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent therewith (except to the extent this Agreement specifically provides otherwise). The initial balance of the Capital Account of each Member shall be in an amount equal to such Member's Initial Capital Contribution. Thereafter, the Capital Account of each Member shall be (i) increased by the sum of (A) the amount of any additional Capital Contributions made by such Member to such Series, (B) the portion of any Net Capital Appreciation (and items thereof) allocated to such Member's Capital Account, and (C) any other income items or other amounts specially allocated or credited to such Member's Capital Account pursuant to this Agreement and (ii) decreased by the sum of (A) any amounts withdrawn by or distributed to the Member from such Series, (B) the portion of any Net Capital Depreciation (and items thereof) allocated to such Member's Capital Account, (C) any Management Fees, withholding taxes or other expense items specially allocated or charged to such Member's Capital Account pursuant to this Agreement. Each Member's Capital Account shall be further adjusted in the manner specified in this Agreement to reflect the Incentive Allocation.

Section 5.04 Company Percentages; Series Percentages

(a) A "Company Percentage" shall be determined for each Member for each Accounting Period by dividing the sum of the balance of each Capital Account of such Member by the aggregate of all Capital Account balances of all Members as of the beginning of such Accounting Period after taking into account any Capital Contributions made as of the beginning of such Accounting Period. The sum of the Company Percentages shall equal 100 percent.

(b) A "Series Percentage" shall be determined for each Member with respect to each Series for each Accounting Period by dividing the balance of such Member's Capital Account with respect to such Series by the aggregate balance of all Members' Capital Accounts with respect to such Series as of the beginning of such Accounting Period after taking into account any Capital Contributions made as of the beginning of such Accounting Period. The sum of the Series Percentages shall equal 100 percent.

Section 5.05 Allocation of Net Capital Appreciation or Net Capital Depreciation.

(a) Subject to the reallocation of any Incentive Allocation (as may be provided in an applicable Series Schedule) and except as otherwise provided in this Agreement, at the end of each Accounting Period, any Net Capital Appreciation or Net Capital Depreciation attributable to a Series with respect to such Accounting Period shall be allocated to the Capital Accounts of the Members with respect to such Series in accordance with their Series Percentages; provided, however, that there shall be specially

allocated to the Capital Account of a Member any Management Fees or other items of income or expense that are borne by that Member other than in accordance with such Member's respective Series Percentage. In the sole discretion of the Manager, any Incentive Allocation may be waived, reduced or calculated differently with respect to certain Members and with respect to different Classes within a Series.

(b) In the event the Manager determines that, based upon tax or regulatory considerations, or for any other reasons as to which the Manager and any Member agree, such Member should not participate (or should be limited in its participation) in the Net Capital Appreciation and Net Capital Depreciation, if any, attributable to any investment, type of investment or any other transaction with respect to a Series (including, without limitation, any New Issue held by such Series), the Manager may allocate such Net Capital Appreciation or Net Capital Depreciation only to the Capital Accounts attributable to such Series of Members to which such considerations or reasons do not apply (or may allocate to the Capital Account attributable to such Series of the Member to which such considerations or reasons apply, the portion of such Net Capital Appreciation or Net Capital Depreciation attributable to such Member's limited participation in such investment, type of investment or other transaction). If any of the considerations or reasons described above apply, then a separate memorandum account may be established in which only the Members having an interest in such investment, type of investment or transaction shall have an interest (any such Member having such an interest shall be referred to as an "Unrestricted Member") and the Net Capital Appreciation and Net Capital Depreciation for each such memorandum account shall be separately calculated.

(c) At the end of each Accounting Period during which a memorandum account created pursuant to Section 5.05(b) (each, a "Memorandum Account") was in existence (or during which an interest in particular investments was otherwise allocated away from one or more Members in a Series), the Capital Account of each Unrestricted Member attributable to a Series may be debited *pro rata* in accordance with the Capital Accounts of all Unrestricted Members attributable to such Series at the opening of such Accounting Period in an amount equal to the interest that would have accrued on the amount used to purchase the investments attributable to the Memorandum Account (the "Purchase Price") had the Purchase Price earned interest at the rate per annum being paid by the Series from time to time during the applicable Accounting Period for borrowed funds, or, if funds have not been borrowed by the Series during such Accounting Period, at the interest rate per annum that the Manager determines would have been paid if funds had been borrowed by the Series during such Accounting Period. The amount so debited shall then be credited to all of the Capital Accounts attributable to such Series *pro rata* in accordance with their Capital Accounts as of the opening of the Accounting Period.

Section 5.06 Special Allocations.

(a) Section 704(b) Allocation Limitations. Notwithstanding Section 5.05, special allocations of Net Capital Appreciation, Net Capital Depreciation, or specific items of income, gain, loss or deduction as shall be required for any Fiscal Year (or other Accounting Period) shall be made as follows:

(i) Minimum Gain Chargeback. Each Series shall allocate items of income and gain among the Members of such Series at such times and in such amounts as necessary to satisfy the minimum gain chargeback requirements of Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

(ii) Qualified Income Offset. Each Series shall specially allocate items of income and gain when and to the extent required to satisfy the "qualified income offset" requirements within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(iii) Other Regulatory Adjustments. The Capital Account attributable to a particular Series also shall be adjusted appropriately to reflect other adjustments required to be made pursuant to the principles of Section 704(b) of the Internal Revenue Code and Treasury Regulations Section 1.704-1 or 1.704-2.

(b) Adjustment of Allocations. In the event that the Manager reasonably determines that the allocations otherwise required pursuant to Section 5.05 or this Section 5.06 would not properly reflect the economic arrangement of the Members or would otherwise cause any inequitable or onerous result for any Member, then, notwithstanding any provision in this Agreement to the contrary, the Manager may adjust such allocations within a Series in such manner as the Manager reasonably determines to be required to prevent such result.

Section 5.07 Amendment of Incentive Allocation. The Manager shall have the right to amend, without the consent of the other Members, Section 5.05 and any applicable Series Schedule so that the Incentive Allocation therein provided conforms to any applicable requirements of the Securities and Exchange Commission and other regulatory authorities; *provided*, *however*, that no such amendment shall increase the Incentive Allocation that otherwise would be made with respect to a Member.

Section 5.08 Valuation of the Series' Assets.

(a) For purposes of determining the value of Investments and other assets of a Series as of a particular date (a "Valuation Date"), assets held by such Series shall be valued in accordance with the valuation policy of the Fund (the "Valuation Policy"), a summary of which shall appear in the Fund's Confidential Private Placement Memorandum, as amended from time to time.

(b) All values assigned to the assets of a Series by the Manager pursuant to the Valuation Policy shall be final and conclusive as to all of the Members.

Section 5.09 Liabilities. Liabilities shall be determined using GAAP, applied on a consistent basis; *provided*, *however*, that the Manager in its sole discretion may provide reserves and holdbacks for estimated accrued expenses, liabilities or contingencies, including general reserves and holdbacks for unspecified contingencies (even if such reserves or holdbacks are not required by GAAP).

Section 5.10 Goodwill. No value shall be placed on the name or goodwill, if any, of the Company or a Series, which shall belong exclusively to the Manager.

Section 5.11 Allocation for Tax Purposes.

(a) For each tax year, items of income, deduction, gain, loss or credit with respect to a Series shall be allocated for income tax purposes among the Members in a Series in such manner as to reflect equitably amounts credited or debited to each Member's Capital Account(s) in such Series for the current and prior Fiscal Years (or relevant portions thereof). Allocations under this Section 5.11 shall be made pursuant to the principles of Sections 704(b) and 704(c) of the Internal Revenue Code, and Regulations Sections 1.704-1(b)(2)(iv)(f) and (g), 1.704-1(b)(4)(i) and 1.704-3(e) promulgated thereunder, as applicable, or the successor provisions to such Sections and Regulations. In the Manager's sole discretion, a Series may aggregate realized gains and losses for this purpose in any manner permitted by Treasury Regulations Section 1.704-3. Items described in this Section 5.11 shall neither be credited nor charged to the Members' Capital Accounts.

(b) Notwithstanding anything to the contrary in Section 5.11(a), if a Member withdraws all or a portion of its Capital Account (including by reason of death) during any taxable year, the Manager may, in its sole discretion, specially allocate items of income and gain, or deduction and loss, as applicable, with respect to the relevant Series to such Member for tax purposes to reduce the amount, if any, by which the amount distributable to the Member upon the withdrawal differs from that Member's tax basis for its withdrawn interest, or otherwise reduce any discrepancy between amounts previously allocated to the Member's Capital Account with respect to the relevant Series and amounts previously allocated to that Member for U.S. federal income tax purposes with respect to such Series.

Section 5.12 Determination by Manager of Certain Matters. All matters concerning the valuation of assets and liabilities of a Series, the allocation of income, deductions, gains and losses among the Members, including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Manager, whose determination shall be final and conclusive as to all of the Members.

Section 5.13 Adjustments to Take Account of Certain Events. If the Internal Revenue Code or regulations promulgated thereunder require a withholding or other adjustment to a Capital Account of a Member attributable to a particular Series, or some other event occurs necessitating in the Manager's judgment an equitable adjustment, the Manager shall make such adjustments in the determination and allocation among the Capital Accounts attributable to such Series of Income, Net Capital Appreciation, Net Capital Depreciation, Capital Accounts, Company Percentages, Series Percentages, items of income, deduction, gain, loss, credit or withholding for tax purposes, accounting procedures or such other financial or tax items as shall equitably take into account such event and applicable provisions of law, and the determination thereof in the sole discretion of the Manager shall be final and conclusive as to all of the Members.

ARTICLE VI

Withdrawals and Distributions
of Capital

Section 6.01 Withdrawals and Distributions in General.

(a) No Member shall be entitled to (i) receive distributions from the Company or a Series, except as provided in Section 6.05 and Section 8.03 or (ii) withdraw any amount from such Member's Capital Account(s), except as provided in Section 6.02 or upon the consent of, and upon such terms as may be determined by, the Manager in its sole discretion.

(b) A Member shall cease to be a Member of the Company or with respect to a Series, as applicable, (i) as of the effective date of the full withdrawal of such Member's Capital Account(s), (ii) as of the effective date of the Transfer of all of such Member's Interests in accordance with Section 7.01, or (iii) in the event of the dissolution of the Company or the termination of a Series, as of the final distribution of the assets of the Company or such Series. As of the effective date of a withdrawal from a particular Series, solely with respect to the withdrawal proceeds, a withdrawing Member shall be considered a creditor of such Series and shall have no rights or liability for future obligations with respect to such Series except that such Member shall (i) have the right to receive, as a creditor, withdrawal proceeds and (ii) continue to be bound by the Sections of this Agreement governing the payment of withdrawal proceeds, including the right of suspension of such payment pursuant to Section 6.07(b).

Section 6.02 Withdrawals. Subject to Section 6.05(d) and Section 6.07 and except as may be provided in an applicable Series Schedule, each Member shall have a right to withdraw all or a portion of the balance in its Capital Account maintained in respect of any Series at such times (each, a "Withdrawal Date"), upon such prior written notice to the Manager, as is set forth in the applicable Series Schedule. If a Member has made Capital Contributions to fund more than one Series or Class, different withdrawal provisions may be imposed with respect to each such Series or Class, which provisions may include, without limitation, the introduction of a Series- or Member-level gate or a Lock-Up Period. A Member's notice of withdrawal shall be irrevocable unless waived by the Manager in its sole discretion. The Manager may elect to treat any partial withdrawal from a Series as a request for a complete withdrawal from such Series if the applicable Capital Account balance of such withdrawing Member immediately following such withdrawal would be less than the applicable minimum as set forth in the Series Schedule. The Manager shall endeavor to make payments of any amounts withdrawn within 60 days after the applicable Withdrawal Date; *provided*, *however*, that if a Member elects to withdraw all of its Capital Account(s) in respect of a Series, such Series shall endeavor to pay the Member an amount equal to at least 90% of its estimated withdrawal proceeds (computed on the basis of unaudited data as of the Withdrawal Date) generally within 60 days after the Withdrawal Date. If a Member elects to withdraw all of its Capital Account in respect of a Series in the aggregate during a Fiscal Year by means of more than one withdrawal, the "hold-back" amount described above will be adjusted to reflect the aggregate withdrawal amounts made during such Fiscal Year. The balance, without interest, shall be paid (subject to audit adjustments) as soon as practicable after completion

of the audit of the Series' books for the year in which such withdrawal occurs, subject to the Manager's right to establish reasonable reserves in the event the Company is subject to any contingent liability at the time of the Member's withdrawal, which could reduce the amount payable in respect of any such withdrawal. The Interest of a Member that gives notice of withdrawal pursuant to this Section 6.02 shall not be included in calculating the Company Percentages or Series Percentages of the Members required to take any action under this Agreement to the extent of the amount requested to be withdrawn.

Section 6.03 Required Withdrawals. The Manager may, in its sole discretion, terminate all or any part of the Capital Account of any Member at any time for any reason or no reason. Unless prohibited under law or regulation, the Manager shall use commercially reasonable efforts to provide each Member prior written notice of a termination of all or any portion of such Member's Capital Account. With respect to any Series that permits withdrawals in the ordinary course, the Member receiving such notice shall be treated for all purposes and in all respects as a Member who has given notice of withdrawal of all or part of its Capital Account(s), as the case may be, under Section 6.02. With respect to any Series that does not permit withdrawals, the Member receiving such notice shall receive the fair value of its Capital Account in connection with its withdrawal.

Section 6.04 Death, Disability, etc. of Members.

(a) The death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of a Member shall not, in and of itself, dissolve the Company or cause the termination of any Series. The legal representatives of a Member shall succeed as assignee to the Member's Capital Account upon the death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of such Member, but shall not be admitted as a substituted Member without the consent of the Manager, in its sole discretion.

(b) In the event of the death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of a Member, the legal representatives of such Member must notify the Manager not more than 30 days after such event occurs, and, if such legal representatives wish to make a complete withdrawal from the Company or any Series, they shall be permitted to withdraw as of the next Withdrawal Date, following notice of the death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of a Member upon 60 days' prior written notice to the Manager. Until such withdrawal occurs, the Capital Account(s) of such Member shall continue to be at the risk of the Company's or Series' business until the effective date of the withdrawal or the earlier termination of the Company or such Series. Payment to the legal representatives shall be made on the same terms, and shall be subject to the same conditions, as set forth in Section 6.02 in respect of a withdrawal by a Member of all of its Capital Account.

Section 6.05 Distributions.

(a) The Manager may, in its sole discretion, make distributions in cash or in kind, or in a combination thereof, in connection with a withdrawal of funds from a

Capital Account by a Member or pursuant to Section 6.03. In each case, the assets to be distributed in kind to any withdrawing Member may be allocated to such withdrawing Member in such amounts as determined by the Manager in its sole discretion. A distribution in kind made with respect to withdrawals made from one or more Series need not, in the Manager's sole discretion, also be made in kind with respect to withdrawals in relation to other Series. Any distributions in kind generally shall be made to all of the Capital Accounts attributable to such Series on a *pro rata* basis in accordance with such Capital Accounts' Series Percentages. Any amounts distributed by a Series to a Member shall be deducted from such Member's Capital Account(s) attributable to such Series.

(b) The Manager may choose, in its sole discretion, which assets of the applicable Series to distribute in kind. If a distribution is made in kind, immediately prior to such distribution, the Manager, in conjunction with the Administrator (if any), shall determine, in accordance with the Valuation Policy, the fair value of the assets distributed and adjust the Capital Accounts of all Members with an interest in such asset upwards or downwards to reflect the difference between the book value and the fair value thereof, as if such gain or loss had been recognized upon an actual sale of such assets and allocated pursuant to Section 5.05. Each such distribution shall reduce the relevant Capital Account of the distributee Member by the fair value thereof. In kind distributions may be comprised of, among other things, interests in special purpose vehicles holding the actual investment or participations in the actual investment or participation notes (or similar derivative instruments), which provide a return with respect to certain Investments of a Series. Such special purpose vehicle shall bear its expenses, including fees payable to the Manager, as the Manager may determine in its discretion.

(c) The provisions of this Section 6.05 shall apply to distributions made in connection with any withdrawal under Article VI and in connection with dissolution pursuant to Article VIII.

(d) (i) The Manager may withhold and pay over to the Internal Revenue Service (or any other relevant taxing authority) such amounts as the Company or a Series is required to withhold or pay over, pursuant to the Internal Revenue Code or any other applicable law, on account of a Member's distributive share of a Series' items of gross income, income, gain or gross sale or disposition proceeds.

(ii) For purposes of this Agreement, any taxes so withheld or paid over from or by the Company or a Series with respect to a Member's distributive share of a Series' gross income, income, gain or gross sale or disposition proceeds shall be deemed to be a distribution or payment to such Member, reducing the amount otherwise distributable to such Member pursuant to this Agreement and reducing the relevant Capital Account of such Member. If the amount of such taxes is greater than any such distributable amounts, then such Member and any successor to such Member's Interest shall pay the amount of such excess to the Series, as a contribution to the capital of the Series.

(iii) The Manager shall not be obligated to apply for or obtain a reduction of or exemption from withholding tax on behalf of any Member that may

be eligible for such reduction or exemption. To the extent that a Member claims to be entitled to a reduced rate of, or exemption from, a withholding tax pursuant to an applicable income tax treaty, or otherwise, the Member shall furnish the Manager with such information and forms as such Member may be required to complete where necessary to comply with any and all laws and regulations governing the obligations of withholding tax agents. Each Member represents and warrants that any such information and forms furnished by such Member shall be true and accurate and agrees to indemnify the Company, any Series and each of the Members from any and all damages, costs and expenses resulting from the filing of inaccurate or incomplete information or forms relating to such withholding taxes.

(e) In the case of certain investments, the Series Schedule relating to the Series or Class established in respect of such investment may provide that upon the sale, disposition or redemption in respect of such Series or Class, the proceeds shall be promptly distributed to the Members participating in the investment.

(f) Notwithstanding anything to the contrary contained in this Agreement, the Company, its Series and the Manager on behalf of the Company and its Series, shall not be required to make a distribution to any Member on account of its Capital Account if such distribution would violate the Act or other applicable law.

Section 6.06 Effective Date of Withdrawal. Unless otherwise specified in this Agreement, the effective date of a Member's withdrawal shall mean the day immediately following: (i) the Withdrawal Date in the case of a withdrawal pursuant to Section 6.02; (ii) the date determined by the Manager pursuant to Section 6.07(c) if a suspension of withdrawal rights has been lifted; or (iii) the date determined by the Manager if such Member shall be required to withdraw in respect of its Capital Account pursuant to Section 6.03.

Section 6.07 Additional Limitations on Withdrawal of Capital Account.

(a) The right of any Member or its legal representatives to withdraw, or to have distributed to it, any amount from its Capital Account attributable to a particular Series pursuant to this Article VI is subject to the provision by the Manager for all Company or Series liabilities in accordance with the Act and for reserves and holdbacks in accordance with Section 5.09. In addition, no withdrawal from a Capital Account shall be permitted that would result in such Capital Account having a negative balance. The unused portion of any reserve shall be distributed to the Members to which the reserve applied, with interest (if any), after the Manager shall have determined that the need therefor shall have ceased.

(b) The Manager may at any time suspend or restrict the right of any Member to withdraw capital or receive a distribution of the amount being withdrawn from the Company or any Series if, in the Manager's judgment, such suspension or restriction would be in the best interests of the Company or such Series. Situations in which such a suspension might occur include, but are not limited to: (i) when a withdrawal would cause the Fund, a Series or the Manager to violate securities or other laws; (ii) when disruptions in investment markets make pricing and/or liquidation of some or all Company or Series

assets difficult or would result in losses if the Company or a Series attempted such liquidations; (iii) when the Manager determines, in consultation with tax advisors, that the withdrawal could result in the Company or a Series being treated as a "publicly traded partnership" that is taxable as a corporation; or (iv) if other events make accurate determination of the value of a Company's or a Series' assets difficult. The Manager will give prompt notice to Members who have made withdrawal requests and are affected by any such suspension, and may (but is not required to) allow such Members to rescind their suspended withdrawal request to the extent of any portion of the withdrawal proceeds not yet remitted.

(c) The Manager shall provide written notice to each Member with an interest in a Series of a suspension of the calculation of the value of such Series or the Company, withdrawal rights and/or payment of withdrawal proceeds for such Series. Upon the determination by the Manager that the condition giving rise to a suspension has ceased to exist and no other condition under which suspension is authorized under Section 6.07(b) exists, such suspension shall be lifted and written notice shall be sent to the Members of such Series regarding the lifting of such suspension and the next date as of which Members will be permitted to withdraw all or a portion of its Capital Account attributable to such Series.

(d) Upon a suspension of withdrawal rights with respect to a particular Series, all pending withdrawal requests relating to such Series will generally become effective on the next Withdrawal Date after the suspension is lifted, on the basis of the Member's Capital Account balance at that time. No requests received subsequent to the declaration of a suspension of withdrawal rights shall be accepted until such time as the Manager permits Members of such Series to submit withdrawal requests in anticipation of lifting the suspension.

(e) The Manager may, by written notice to any Member, suspend the payment of withdrawal proceeds payable to such Member if the Manager reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Company, the Manager or any of the Company's other service providers.

Section 6.08 Reserves; Adjustments for Certain Future Events.

(a) Appropriate reserves may be created, accrued and charged proportionately against the Capital Accounts of the Members of the Company (or any Series) for contingent liabilities of the Company (or such Series), such reserves to be in the amounts (subject to increase or reduction) that the Manager deems necessary or appropriate in its sole discretion. The Manager may increase or reduce any such reserve from time to time by such amounts as the Manager in its discretion deems necessary or appropriate. At the sole discretion of the Manager, the amount of any such reserve, or any increase or decrease therein, may be charged or credited, as appropriate, to the Capital Accounts of those Persons who are Members of the Company (or such Series) at the time when such reserve is created, increased or decreased, as the case may be, or alternatively may be charged or credited to those Persons who were Members of the Company (or such Series)

at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

(b) If the Manager determines in its sole discretion that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those Persons who were Members of the Company (or applicable Series) during such prior period or periods.

(c) If any amount is to be charged or credited to a Person who is no longer a Member of the Company (or applicable Series), such amount shall be paid by or to such Person, as the case may be, in cash. In the case of a charge, the former Member shall be obligated to pay the amount of the charge to the Company upon thirty (30) days' prior written notice to such former Member (the "Notice Period"); provided that (i) in no event shall a former Member be obligated to make a payment to the Company (or any Series) exceeding the lesser of (x) the amount of its Capital Account(s) (or Capital Account(s) in respect of such Series) at the time to which the charge relates, and (y) the sum of the balance of such Member's Capital Account(s) (or Capital Account(s) in respect of such Series) at the time of the demand plus any distributions or withdrawals received by the Member from the Company (or from the applicable Series) subsequent to the date to which the charge relates and (ii) no such demand shall be made to the extent prohibited by applicable law. Failure to pay any such amounts within ten (10) days following the expiration of the Notice Period may, in the sole discretion of the Manager, result in interest being incurred on such outstanding amounts at the Treasury Bill Rate in effect at that time from the expiration of the ten (10) day period. To the extent the Company (or applicable Series) fails to collect, in full, any amount required to be charged to such former Member pursuant to paragraph (a) or (b) of this Section 6.08, whether due to the expiration of the applicable limitation period, if any, or for any other reason whatsoever, the deficiency may be charged proportionately to the Capital Accounts of the current Members of the Company (or applicable Series). Any amounts retained by the Company (or a Series) may be treated, for accounting purposes, as either a reserve or an accrued expense, in the sole discretion of the Manager.

## ARTICLE VII

## Transfers of Interest

Section 7.01 Assignability of Interest. Without the prior written consent of the Manager, which may be withheld in its sole discretion, a Member may not (i) make a Transfer, in whole or in part, to any Person except in accordance with Section 6.04 or by other operation of law, or (ii) substitute for itself as a Member any other Person. Any attempted Transfer or substitution not made in accordance with this Section 7.01, to the fullest extent permitted by law, shall be void.

Section 7.02 Substitute Member. No Transferee of an Interest shall become a Substitute Member unless all of the following conditions have been satisfied, within such reasonable time period as the Manager shall determine:

(a) the Transfer is permitted under Section 7.01;

(b) the Company receives a duplicate of all documents effecting the Transfer from the Transferor to the Transferee (which documents may be delivered via facsimile or electronic mail);

(c) the Manager consents to the admission of the Transferee as a Substitute Member, which consent may be granted or withheld in the Manager's sole discretion; and

(d) the Transferee has executed an instrument, in form and substance satisfactory to the Manager, accepting and agreeing to be bound by all terms and conditions of this Agreement and the relevant Series Schedule(s).

## ARTICLE VIII

## Duration and Dissolution of the Company and its Series

Section 8.01 Term. The term of the Company began on the date the Certificate of Formation of the Company was filed, and shall continue until cancellation of the Certificate of Formation of the Company in accordance with this Agreement. Each Series shall be formed on the effective date of the applicable Series Schedule and, unless otherwise specified in the applicable Series Schedule, shall continue in perpetuity unless the Series is terminated in accordance with this Article VIII.

Section 8.02 Dissolution.

(a) The Company or any Series of the Company shall be dissolved and terminated and their respective affairs wound up upon the first to occur of any of the following events:

(i) a determination by the Manager that the Company should be dissolved or a Series should be terminated;

(ii) at any time there are no Members in such Series (in the case of the dissolution of a Series) or in all Series of the Company (in the case of a dissolution of the Company), unless the business of the Series or the Company (as applicable) is continued in accordance with the Act;

(iii) any event that results in the Manager ceasing to be a manager of the Company under the Act; provided that the Company shall not be dissolved and required to be wound up in connection with any such event if (A) at the time of the occurrence of such event there is at least one remaining manager of the Company who is hereby authorized to and does carry on the business of the Company, or (B) within 90 days after the occurrence of such event, a Majority-in-Interest of the Members agree in writing or vote to continue the business of the

Company and to the appointment, effective as of the date of such event, if required, of one or more additional managers of the Company; or

(iv) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b) Upon a determination to dissolve the Company or terminate a Series under Section 8.02 (a) (i), (ii), (iii) or (iv), withdrawal requests and distributions in respect of pending withdrawals may not be made.

Section 8.03 Winding Up.

(a) Upon dissolution of the Company or the termination of any Series, the Manager shall, out of assets of the Company or such Series, first pay the expenses of winding up, liquidation and dissolution of the Company or terminating such Series and thereafter all of the remaining assets of the Company or such Series shall be distributed. The Manager shall, within no more than 60 days after completion of the Company's or any Series' financial statements (or, if applicable, completion of audited financial statements), make such distributions, in the following manner and order:

(i) to creditors of the Company or such Series, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company or such Series (as applicable) (whether by payment or by establishment of reserves); and

(ii) to all the Members of the Company (in the event of the dissolution of the Company) or to the Members of such Series (in the event of the termination of such Series) in accordance with such Members' Company or Series Percentages, as applicable.

(b) The Manager, in its sole discretion, or a Majority-in-Interest of Members if the Company no longer has a Manager, may at any time and from time to time, designate one or more liquidators, including one or more members of the Manager, who shall have full authority to wind up and liquidate the business of the Company or terminate a Series, as applicable, and to make final distributions as provided in this Section 8.03. The appointment of any liquidator may be revoked or a successor or additional liquidator or liquidators may be appointed at any time by an instrument in writing signed by the Manager or a Majority-in-Interest of Members, as the case may be. Any such liquidator may receive compensation as shall be fixed, from time to time, by the Manager or a Majority-in-Interest of Members, as the case may be.

(c) In the event that the Company is terminated on a date other than the last day of a Fiscal Year, the date of such termination shall be deemed to be the last day of a Fiscal Year for purposes of adjusting the Capital Accounts of the Members pursuant to Section 5.04(a) and Section 5.06. For purposes of distributing the assets of the Company upon dissolution, the Manager shall be entitled to a return, on a *pari passu* basis with the Members, of the amount standing to its credit in its Capital Account.

Section 8.04 Time for Liquidation, etc. A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company or the termination of a Series and the discharge of liabilities to creditors so as to enable the Company or such Series to seek to minimize potential losses upon such liquidation. The provisions of this Agreement and of the relevant Series Schedule, including the provisions relating to the payment of the Management Fee and the making of the Incentive Allocation, shall remain in full force and effect during the period of winding up and, in the case of the dissolution of the Company, until the filing of a certificate of cancellation of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, or, in the case of the termination of a Series, until the termination of such Series.

ARTICLE IX

Tax Returns; Reports to Members; Books and Records

Section 9.01 Filing of Tax Returns. The Manager or its designated agent shall prepare and file, or cause the accountants of the Company to prepare and file, a federal information tax return for each Series in compliance with Section 6031 of the Internal Revenue Code, and any required state and local income tax and information returns for each tax year of a Series.

Section 9.02 Partnership Representative. The Manager shall be designated on each Series' annual federal information tax return, and have full powers and responsibilities, as the Series' Partnership Representative within the meaning of Section 6223(a) of the Internal Revenue Code, and any other similar representative under any state, local or non-U.S. tax laws. In the event a Series or the Company shall be the subject of an income tax audit by any federal, state or local authority, to the extent such Series or the Company (as applicable) is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Partnership Representative shall be authorized to make such elections and otherwise act for, and its decision shall be final and binding upon, such Series or the Company (as applicable) and each Member thereof. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by such Series or the Company (as applicable). Each Member (or former Member) agrees to indemnify the relevant Series for any taxes (and related interest, penalties or other charges or expenses) payable by the Series and attributable to such Member's (or former Member's) interest in the Series, as reasonably determined by the Manager. The foregoing obligation shall survive the withdrawal of any Member, the dissolution and liquidation of the Company or relevant Series, or both.

Section 9.03 Financial Statements. Except as may be provided in a Series Schedule, the Company shall use commercially reasonable efforts to prepare and make available to each Member financial statements of the Company. The Company will also use commercially reasonable efforts to make available periodic performance information, no less frequently than quarterly, to the Members after the end of each calendar quarter (other than the last calendar quarter of each Fiscal Year).

Section 9.04 Reports to Members. Within a reasonable time after the end of each tax year of a Series, each Series shall prepare and make available, or cause its accountants to prepare and make available, to each Member a report setting forth in sufficient detail such information as shall enable such Member to prepare its federal income tax return in accordance with the laws, rules and regulations then prevailing.

Section 9.05 Member Information. Each Member agrees to furnish to the Manager such information as may be required for the Company or any Series to comply with any tax accounting, withholding and reporting obligations, including any obligation to make mandatory basis adjustments to Series property pursuant to Section 754 of the Code.

Section 9.06 Books and Records.

(a) The Manager, together with the Administrator (if any), shall keep books and records pertaining to the Company's and each Series' affairs showing all of its assets and liabilities, receipts and disbursements, gains and losses, Members' Capital Accounts and all transactions entered into by the Company and its Series. Such books and records of the Company and its Series shall be kept at the Company's office (or at an Administrator's office as directed by the Manager from time to time).

(b) Except as otherwise expressly provided in this Agreement, each Member shall have the right to obtain any information contained in the books and records of the Company or its Series upon reasonable advance notice, including any information relating to the Company's or its Series' investment activity.

Section 9.07 Withholding Tax. Any taxes, fees or other charges the Company, a Series or the Manager is required to withhold under applicable law with respect to any Member shall be so withheld (and paid to the appropriate governmental authorities) and shall be deducted from the relevant Capital Account(s) of, or otherwise collected from, such Member and paid in accordance with applicable law.

ARTICLE X

Confidential Information

Section 10.01 Confidentiality.

(a) In connection with the organization of the Company, its Series and their ongoing business, the Members will receive or have access to Confidential Information. Each Member agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Member's tax returns) or disclose to any Person, any Confidential Information except (i) to its Authorized Representatives on a need to know basis who are subject to customary confidentiality obligations; (ii) with the prior written consent of the Manager, to such Member's members, partners or shareholders, provided that such recipient is subject to a corresponding confidentiality obligation, a copy of which shall be provided to the Manager upon request, or (iii) as otherwise required by any regulatory authority, law or regulation,

or by legal process. Prior to making any disclosure required by any regulatory authority, law or regulation, or by legal process, each Member shall use its reasonable best efforts to notify the Manager of such disclosure so that the Manager shall have reasonable opportunity to contest or attempt to limit such disclosure. Prior to any disclosure to any Authorized Representative of a Member, such Member must advise such Authorized Representative of the obligations set forth in this Section 10.01.

(b) Each Member agrees that the Manager has the right to keep confidential from the Members, for such period of time as the Manager in its sole discretion deems reasonable, any Confidential Information. Each Member further agrees that the Manager may keep confidential from certain Members certain information to the extent that the Manager reasonably determines that: (x) the Manager is required by law, rule, regulation, interpretation, or order or by agreement with a third party to keep such information confidential or (y) disclosure of such information to such Members is not in the best interest of the Manager or a Series and there is a reasonable likelihood that such disclosure would have an adverse effect upon the Manager or any Series, its investors or any investment it has made.

Section 10.02 Equitable and Injunctive Relief. The Members acknowledge that (a) the provisions of Section 10.01 hereof are intended to preserve the unique relationship among the Members and with the Company and (b) the provisions of Section 10.01 are intended to preserve the value and goodwill of the business of the Company and each Series; and that, in the event of a breach or a threatened breach by any Member of its obligations under Section 10.01, the Company and the Manager shall not have an adequate remedy at law. Accordingly, in the event of any such breach or threatened breach by a Member, the Company and the Manager shall be entitled to such equitable and injunctive relief as may be available to restrain such Member and any Person participating in such breach or threatened breach from the violation of the provisions thereof. Nothing in this Agreement shall be construed as prohibiting the Company or the Manager from pursuing any other remedies available at law or in equity for such breach or threatened breach, including the recovery of damages.

## ARTICLE XI

## Miscellaneous

Section 11.01 Entire Agreement. This Agreement (including the Series Schedules) and each Subscription Agreement supersede any and all existing agreements, oral or written, between or among the Company (for itself or on behalf of any Series), the Manager and the Members, with respect to the Company.

Section 11.02 Execution of Other Documents. Each of the Members agrees to execute upon demand such certificates, counterparts, instruments and documents as may from time to time be required to be filed or recorded by law.

Section 11.03 Power of Attorney. Each of the Members hereby appoints the Manager as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file:

(a) a Certificate of Formation of the Company and any amendments thereto as may be required under the Act;

(b) any duly adopted amendment to this Agreement (including any Series Schedule);

(c) any and all instruments, certificates and other documents that may be deemed necessary or desirable to effect the dissolution and winding-up of the Company (including a certificate of cancellation of the Certificate of Formation) or a Series; and

(d) any business certificate, fictitious name certificate, amendment thereto or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company or a Series, or required by any applicable federal, state or local law.

The power of attorney hereby granted by each of the Members is coupled with an interest, is irrevocable and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of such Member; *provided*, *however*, that such power of attorney will terminate upon the substitution of another member for all of such Member's interest in the Company or upon the complete withdrawal of such Member from participation in the Company.

Section 11.04 Amendments to Company Agreement. This Agreement (including any Series Schedule) may be amended in any manner the Manager deems desirable. The Manager shall promptly give notice to Members of any amendment made to this Agreement. No such amendment shall, except as provided below, become effective as to any Member without the consent of such Member or the consent of a Majority-in-Interest of the Members of the Company or the applicable Series, as applicable. Notwithstanding the foregoing, any amendment made by the Manager may be immediately effective if the amendment is made (i) to cure any ambiguity, to correct or supplement any provision herein that may be inconsistent with any other provision herein, to comply with any applicable requirements of law, or to make any other provision with respect to matters or questions arising under this Agreement that will not be materially inconsistent with the provisions of this Agreement; (ii) to delete or add any provision of this Agreement required to be so deleted or added by any Federal agency or by a state "Securities" or "Corporation" commission, department or administrator, or similar such body, agency or official, which addition or deletion is deemed by such body, agency or official to be for the benefit or protection of the Members; (iii) to admit additional Members; or (iv) to make any change that does not adversely affect the Members in any material respect.

Section 11.05 Use of "Broad Street Global" Name. Subject to customary quality control and termination rights, the Manager hereby grants to the Company and each Series a non-exclusive, non-transferable, royalty free license to use the name "Broad Street Global" so long as the Manager or an Affiliate of the Manager is a Manager of the Company. The Company agrees to change its name to a name not including the words "Broad Street Global" in the event that the Manager or its Affiliate is no longer a Manager of the Company.

Section 11.06 Electronic Communications. The Company and the Manager may deliver and make reports, statements and other communications, including, without limitation, financial statements, the Form 1065, Schedules K-1 and other tax related information and documentation ("Account Communications"), available to the Members in electronic form, such as e-mail or by posting on a web site (including, without limitation, any electronic dataroom or similar platform made available to the Member). Each Member consents to the electronic delivery of Account Communications. An email or other notice will be sent to each affected Member when a new Account Communication is posted on any website or electronic dataroom. Each Member is responsible for reading each Account Communication posted to such data room and each Member will be bound by the terms of all materials posted in accordance with the terms of this Agreement.

Section 11.07 Choice of Law. Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be governed by and construed under the laws of the State of Delaware applicable to contracts made and to be entirely performed in such state and, without limitation thereof, that the Act as now adopted or as may be hereafter amended shall govern all company aspects of this Agreement.

Section 11.08 Severability. If any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such applicable law. Any provision hereof which may be held invalid or unenforceable under any applicable law shall not affect the validity or enforceability of any other provisions hereof, and to this extent the provisions hereof shall be severable.

Section 11.09 Forum. Any controversy between the Members involving the construction or application of any of the terms, covenants, or conditions of this Agreement will be submitted to arbitration in New York, New York, on the request of the Company or any Member, and the arbitration will comply with and be governed by the provisions of the commercial arbitration rules of the American Arbitration Association; *provided*, *however*, that nothing in this paragraph will constitute a waiver of any right any party to this Agreement may have to choose a judicial forum to the extent such a waiver would violate applicable law.

Section 11.10 Counterparts. Counterparts may be executed through the use of separate signature pages or in any number of counterparts with the same effect as if the parties executing such counterparts had all executed one counterpart. Each party understands and agrees that any portable document format (PDF) file, facsimile or other reproduction of its signature on any counterpart (including any electronic signature) shall be equal to and enforceable as its original signature and that any such reproduction shall be a counterpart hereof that is fully enforceable in any court or arbitral panel of competent jurisdiction.

Section 11.11 Successors and Assigns. This Agreement shall inure to the benefit of each Member and the executors, administrators, estates, heirs, legal successors and representatives of such Member.

Section 11.12 No Waiver. The failure of a party to insist upon strict adherence to any term or provision of this Agreement on any occasion shall not be considered a waiver thereof

or deprive that party of the right thereafter to insist upon strict adherence to that term or provision or any other term or provision of this Agreement.

Section 11.13 Notices. Each notice relating to this Agreement to the Manager or a Member shall be in writing and delivered in person, by registered or certified mail, by Federal Express or similar overnight courier service, by electronic mail, by facsimile or by posting such notice to a website, dataroom or similar electronic platform (provided a notice that a document has been posted is separately sent to the applicable party). All notices to the Company or a Series shall be addressed to its principal office and place of business. All notices addressed to a Member shall be addressed to such Member at the address set forth on the books and records of the Company or by posting to a website, dataroom or similar electronic platform. Any Member may designate a new address by notice to that effect given to the Company. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when delivered personally, if delivered on a Business Day; the next Business Day after personal delivery if delivered personally on a day that is not a Business Day; four Business Days after being deposited in the United States mail, postage prepaid, return receipt requested, if mailed; on the next Business Day after being deposited for next day delivery with Federal Express or similar overnight courier; when sent, if e-mailed on a Business Day; the next Business Day following the day on which the e-mail is sent if e-mailed on a day that is not a Business Day; when receipt is acknowledged, if facsimiled on a Business Day; the next Business Day following the day on which receipt is acknowledged if facsimiled on a day that is not a Business Day; when posted, if posted to a website, dataroom or similar electronic platform with separate notice of a posted document on a Business Day and the next Business Day if not posted on a Business Day.

Section 11.14 Tax Elections. The Manager may, in its sole discretion, cause the Company or any Series to make or revoke any tax election that the Manager deems appropriate, including an election pursuant to Section 754 of the Internal Revenue Code.

Section 11.15 No Third-Party Rights. Except for the provisions of Sections 4.05 and 4.06, the provisions of this Agreement, including the provisions of Sections 3.02 and 6.02, are not intended to be for the benefit of any creditor or other Person (other than the Members in their capacities as such) to which any debts, liabilities or obligations are owed by (or who otherwise have a claim against or dealings with) the Company, a Series or any Member, and, to the fullest extent permitted by law, no such creditor or other Person shall obtain any rights under any of such provisions (whether as a third-party beneficiary or otherwise) or shall by reason of any such provisions have a right to make any claim in respect to any debt, liability or obligation (or otherwise) including any debt, liability or obligation against the Company, such Series or any Member.

Section 11.16 Headings. The table of contents, titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Agreement. References to "Article" or "Section" in this Agreement shall be deemed to refer to the indicated Article or Section of this Agreement, unless the context clearly indicates otherwise.

Section 11.17 Counsel to the Company. Company Counsel may also serve as counsel to the Manager. The Manager may execute on behalf of the Company or Series (as

applicable) any consent to the representation of the Company or such Series that Company Counsel may request pursuant to the applicable rules of professional conduct in any jurisdiction. Company Counsel is not representing any Members with respect to its becoming a Member, or with respect to any action taken by the Company or the Series, whether or not Company Counsel has represented such Members with respect to other matters.

Section 11.18 Waiver of Partition. Except as may otherwise be required by law in connection with the winding-up, liquidation and dissolution of the Company or the termination of a Series, each Member hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Company's or such Series' property.

**[Signature page follows]**

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of the date first set forth above.

MANAGER:

Broad Street Global Management LLC

By:______________________________
Name: Steven Baldassarra
Title: Managing Member

MEMBERS:

By: Broad Street Global Management LLC, as attorney-in-fact

By:______________________________
Name: Steven Baldassarra
Title: Managing Member

# ITEM 3

**Summary of Lock-Up Agreement**

**Lock-Up Term**
Duration: Begins at the Closing of the business combination. Continues for 42 months after Closing, unless earlier terminated if Pubco is sold, merged, liquidated, or reorganized in a way that all stockholders exchange their shares for cash, securities, or property.

**Transfer Restrictions**
During the Lock-Up Period, the Holder cannot sell, pledge, transfer, gift, assign, or otherwise dispose of any Restricted Securities; enter into swaps or hedging arrangements transferring economic interest; or publicly announce any such intent.

Exceptions (Permitted Transfers): Transfers by gift, inheritance, divorce, or to certain related entities (family trusts, affiliates, etc.)—but only if the transferee signs a similar lock-up undertaking.

**Leak-Out Provision**
After the 2-year anniversary of Closing: The Holder may sell up to 1/18 of total holdings per month for 18 months (months 25–42), only if the 10-day VWAP exceeds $16.00/share. Monthly sales capped at 5% of average daily trading volume over the prior 10 days.

**Suspension / Early Release Triggers**
• Automatic suspension of restrictions if the stock trades above $35.00/share for two consecutive trading days. Restrictions reinstated if it falls below $35.00 for two days.
• After 1 year post-Closing: If average monthly trading volume exceeds 1 million shares/day and price > $16/share, the Holder may sell up to 10% of average monthly volume during any 30-day period.

**Summary Timeline**

| Period | Condition | Holder Sale Rights |
|---|---|---|
| 0–24 months | Full lock-up (subject to early release) | No sales |
| 25–42 months | Leak-out (if VWAP > $16) | 1/18 per month ≤ 5% ADV |
| > 42 months | Lock-up expires | Freely tradable |
| Early release | Stock > $35 for 2 days | Lock-up suspended |
| Volume release | After 1 year, >1M sh/day + price > $16 | Up to 10% avg monthly vol. / 30 days |

**FORM OF LOCK-UP AGREEMENT**

THIS LOCK-UP AGREEMENT (this "***Agreement***") is made and entered into as of [●], 2025 by and among (i) SWB Holdings, a Cayman Islands exempted company ("***Pubco***"), and (ii) the undersigned (the "***Holder***"). Any capitalized term used but not defined in this Agreement will have the meaning ascribed to such term in the BCA (defined below)

**[WHEREAS**, Pubco is a party to that certain Business Combination Agreement, dated as of [● ], 2025 (as amended from time to time in accordance with the terms thereof, the "***BCA***"), by and among (i) Soulpower Acquisition Corporation, an exempted company incorporated in the Cayman Islands with limited liability ("***SPAC***"), (ii) Pubco, (iii) [SPAC Merger Sub], a [Cayman Islands exempted company and a wholly-owned subsidiary of Pubco (*"**SPAC Merger Sub**"),* (iv) [Company Merger Sub], a Cayman Islands exempted company and a wholly-owned subsidiary of Pubco (*"**Company Merger Sub**")* and *(*v) the Company, pursuant to which, subject to the terms and conditions thereof, among other matters, (a) SPAC Merger Sub will merge with and into the SPAC, with the SPAC continuing as the surviving entity (the "***SPAC Merger***"), and with security holders of the SPAC receiving substantially equivalent securities of Pubco, and (b) Company Merger Sub will merge with and into the Company, with the Company continuing as the surviving entity (the "***Company Merger***", and together with the SPAC Merger, the "***Mergers***" and, collectively with the other transactions contemplated by the BCA, the "***Transactions***"), and with equity holders of the Company, including Holder, receiving [ordinary shares of Pubco], and as a result of which Mergers, among other matters, the SPAC and the Company will become wholly-owned subsidiaries of Pubco and Pubco will become a publicly traded company, all upon the terms and subject to the conditions set forth in the BCA and in accordance with the provisions of the applicable law;][1]

**WHEREAS**, immediately prior to the consummation of the Transactions (the "***Closing***"), Holder is a holder of the Company Units in such amounts as set forth underneath Holder's name on the signature page hereto; and

**WHEREAS**, pursuant to the BCA, and in view of the valuable consideration to be received by Holder thereunder, the parties desire to enter into this Agreement, pursuant to which the [merger consideration securities to be received by Holder] in the Transactions (all such securities, together with any securities paid as dividends or distributions with respect to such securities or into which such securities are exchanged or converted, the *"**Restricted Securities**"*) shall become subject to limitations on disposition as set forth herein.

**NOW, THEREFORE**, in consideration of the premises set forth above, which are incorporated in this Agreement as if fully set forth below, and intending to be legally bound hereby, the parties hereby agree as follows:

1. <u>Lock-Up Provisions</u>.

(a) Subject to Section 1(b), Holder hereby agrees not to, with respect to Restricted Securities, during the period commencing from the Closing and ending on the earlier of (x) [42 months] after the date of the Closing, and (y) the date after the Closing on which Pubco consummates a liquidation, merger, capital stock exchange, reorganization or other similar transaction with an unaffiliated third party that results in all of Pubco's stockholders having the right to exchange their equity holdings in Pubco for cash, securities or other property (such period, a "***Lock-Up Period***"): (i) lend, offer, pledge, hypothecate, encumber, donate, assign, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly

[1] Note to Draft: to be updated to conform to the description of the BCA.

or indirectly, any Restricted Securities, (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Restricted Securities, or (iii) publicly disclose the intention to do any of the foregoing, whether any such transaction described in clauses (i), (ii) or (iii) above is to be settled by delivery of Restricted Securities or other securities, in cash or otherwise (any of the foregoing described in clauses (i), (ii) or (iii), a "***Prohibited Transfer***"). The foregoing sentence shall not apply to the transfer or other disposition of any or all of the Restricted Securities owned by Holder (I) by gift, charitable contribution, will or intestate succession upon the death of Holder, (II) to any Permitted Transferee (defined below), (III) pursuant to a court order or settlement agreement related to the distribution of assets in connection with the dissolution of marriage or civil union or (IV) the establishment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of Restricted Securities; provided, that such plan does not provide for the transfer of Restricted Securities during the applicable Lock-Up Period; provided, however, that in any of cases (I), (II), (III) or (IV) it shall be a condition to such transfer that the transferee executes and delivers to Pubco an agreement stating that the transferee is receiving and holding the Restricted Securities subject to the provisions of this Agreement applicable to Holder, and there shall be no further transfer of such Restricted Securities except in accordance with this Agreement. As used in this Agreement, the term "***Permitted Transferee***" shall mean: (1) the members of Holder's immediate family (for purposes of this Agreement, "immediate family" shall mean with respect to any natural person, any of the following: such person's spouse or domestic partner, the siblings of such person and his or her spouse or domestic partner, and the direct descendants and ascendants (including adopted and step children and parents) of such person and his or her spouses or domestic partners and siblings), (2) any trust for the direct or indirect benefit of Holder or the immediate family of Holder, (3) if Holder is a trust, the trustor or beneficiary of such trust or the estate of a beneficiary of such trust, (4) if Holder is an entity, its partners, shareholders, members or owners of similar equity interests in Holder upon the liquidation and dissolution of Holder, or (5) any affiliate of Holder.

(b) Notwithstanding anything to the contrary contained herein, commencing on the second anniversary of the Closing date and continuing for a period of 18 months thereafter (such period, "***Leak-out Period***"), if the 10-day volume weighted average price of the Pubco Class A shares exceeds $16.00 per share, Holder may sell its Restricted Securities in an amount not to exceed 1/18th of its aggregate holdings of the Restricted Securities each calendar month. Such sales of Restricted Securities during the Leak-Out period shall be subject to a cap of 5% of the average daily trading volume of the Pubco Class A shares over the prior 10 trading days.

(c) Each of the Lock-Up Period and the Leak-Out Period shall be suspended if the closing price of the Pubco Class A shares exceeds $35.00 per share for two consecutive trading days, however, such restrictive periods will be reinstated if the price of the Pubco Class A shares falls below $35.00 per share for two consecutive trading days. Additionally, notwithstanding Section 1(a) and 1(b), if after the one year anniversary of the Closing date, the average monthly trading volume of the Pubco Class A shares is greater than 1,000,000 shares per day, then Holder shall be permitted to sell or otherwise transfer or dispose of an aggregate number of Pubco Class A shares up to 10% of the average monthly trading volume over any 30-day period; provided that the [closing price][2] of the Pubco Class A shares exceeds $16.00 per share at such time.

(d) If any Prohibited Transfer is made or attempted contrary to the provisions of this Agreement, such purported Prohibited Transfer shall be null and void ab initio, and Pubco shall refuse to recognize any such purported transferee of the Restricted Securities as one of its equity holders for any purpose. In order to enforce this Section 1, Pubco may impose stop-transfer instructions with respect to the Restricted Securities of Holder (and Permitted Transferees and assigns thereof) until the end of the Lock-Up Period.

[2] Note to Draft: Confirm whether this is the closing price of the VWAP.

(e) During the applicable Lock-Up Period, each certificate evidencing any Restricted Securities shall be stamped or otherwise imprinted with a legend in substantially the following form, in addition to any other applicable legends:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER SET FORTH IN A LOCK-UP AGREEMENT, DATED AS OF [●], 2025, BY AND AMONG THE ISSUER OF SUCH SECURITIES (THE "ISSUER"), AND THE ISSUER'S SECURITY HOLDER NAMED THEREIN, AS AMENDED. A COPY OF SUCH LOCK-UP AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE ISSUER TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(f) For the avoidance of any doubt, Holder shall retain all of its rights as a stockholder of Pubco during the applicable Lock-Up Period, including the right to vote any Restricted Securities and to receive any and all dividends or distributions.

2. Miscellaneous.

(a) Binding Effect; Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns. This Agreement and all obligations of Holder are personal to Holder and may not be transferred or delegated by Holder at any time. Pubco may freely assign any or all of its rights under this Agreement, in whole or in part, to any successor entity (whether by merger, consolidation, equity sale, asset sale or otherwise) without obtaining the consent or approval of Holder.

(b) Third Parties. Nothing contained in this Agreement or in any instrument or document executed by any party in connection with the transactions contemplated hereby shall create any rights in, or be deemed to have been executed for the benefit of, any person or entity that is not a party hereto or thereto or a successor or permitted assign of such a party.

(c) Governing Law; Jurisdiction. This Agreement and any dispute or controversy arising out of or relating to this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of law principles thereof. All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any state or federal court located in Delaware (or in any appellate courts thereof) (the "***Specified Courts***"). Each party hereto hereby (i) submits to the exclusive jurisdiction of any Specified Court for the purpose of any Action arising out of or relating to this Agreement brought by any party hereto and (ii) irrevocably waives, and agrees not to assert by way of motion, defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any Specified Court. Each party agrees that a final judgment in any Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each party irrevocably consents to the service of the summons and complaint and any other process in any other action or proceeding relating to the transactions contemplated by this Agreement, on behalf of itself, or its property, by personal delivery of copies of such process to such party at the applicable address set forth in Section 2(f). Nothing in this Section 2(c) shall affect the right of any party to serve legal process in any other manner permitted by applicable law.

(d) WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2(d).

(e) Interpretation. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement. In this Agreement, unless the context otherwise requires: (i) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa; (ii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding or succeeding such term and shall be deemed in each case to be followed by the words "without limitation"; (iii) the words "herein," "hereto," and "hereby" and other words of similar import in this Agreement shall be deemed in each case to refer to this Agreement as a whole and not to any particular section or other subdivision of this Agreement; and (iv) the term "or" means "and/or". The parties have participated jointly in the negotiation and drafting of this Agreement. Consequently, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(f) Notices. All notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered (i) in person, (ii) by facsimile or other electronic means, with affirmative confirmation of receipt, (iii) one Business Day after being sent, if sent by reputable, nationally recognized overnight courier service or (iv) three (3) Business Days after being mailed, if sent by registered or certified mail, pre-paid and return receipt requested, in each case to the applicable party at the following addresses (or at such other address for a party as shall be specified by like notice):

| | |
|---|---|
| *If to Pubco, to:*<br><br>[SWB Holdings]<br>[ ]<br><br>Attn: Justin Lafazan, CEO<br>Telephone No.: [ ]<br>E-mail: [ ] | *With a copy (which shall not constitute notice) to:*<br>[SPAC Counsel]<br>[ADDRESS]<br><br>and<br>Ellenoff Grossman & Schole LLP<br>1345 Avenue of the Americas, 11th Floor<br>New York, New York 10105<br>Attn: Matthew A. Gray, Esq., Esq.<br>Facsimile No.: (212) 370-7889<br>Telephone No.: (212) 370-1300<br>Email: mgray@egsllp.com |

*If to Holder, to*: the address set forth below Holder's name on the signature page to this Agreement.

(g) Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of Pubco, and Holder. No failure or delay by a party in exercising any right hereunder shall operate as a waiver thereof. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

(h) Authorization on Behalf of Pubco. The parties acknowledge and agree that notwithstanding anything to the contrary contained in this Agreement, any and all determinations, actions or other authorizations under this Agreement on behalf of Pubco after the Closing, including enforcing Pubco's rights and remedies under this Agreement, or providing any waivers or amendments with respect to the provisions hereof, shall solely be made, taken and authorized by the vote or consent of a majority of the Disinterested Directors. For purposes hereof, a "Disinterested Director" will mean an independent director disinterested in this Agreement or the BCA then serving on Buyer's board of directors. Without limiting the foregoing, in the event that Holder or Holder's Affiliate serves as a director, officer, employee or other authorized agent of Pubco or any of its current or future Affiliates, Holder and/or Holder's Affiliate shall have no authority, express or implied, to act or make any determination on behalf of Pubco or any of its current or future Affiliates in connection with this Agreement or any dispute or Action with respect hereto..

(i) Severability. In case any provision in this Agreement shall be held invalid, illegal or unenforceable in a jurisdiction, such provision shall be modified or deleted, as to the jurisdiction involved, only to the extent necessary to render the same valid, legal and enforceable, and the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby nor shall the validity, legality or enforceability of such provision be affected thereby in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties will substitute for any invalid, illegal or unenforceable provision a suitable and equitable provision that carries out, so far as may be valid, legal and enforceable, the intent and purpose of such invalid, illegal or unenforceable provision.

(j) Specific Performance. Holder acknowledges that its obligations under this Agreement are unique, recognizes and affirms that in the event of a breach of this Agreement by Holder, money damages will be inadequate and Pubco will have no adequate remedy at law, and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by Holder in accordance with their specific terms or were otherwise breached. Accordingly, Pubco shall be entitled to seek an injunction or restraining order to prevent breaches of this Agreement by Holder and to enforce specifically the terms and provisions hereof, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such party may be entitled under this Agreement, at law or in equity.

(k) Entire Agreement. This Agreement constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled; provided, that, for the avoidance of doubt, the foregoing shall not affect the rights and obligations of the parties under the BCA or any Ancillary Document. Notwithstanding the foregoing, nothing in this Agreement shall limit any of the rights or remedies of Pubco or any of the obligations of Holder under any other agreement between Holder and Pubco or any certificate or instrument executed by Holder in favor of Pubco, and

nothing in any other agreement, certificate or instrument shall limit any of the rights or remedies of Pubco or any of the obligations of Holder under this Agreement.

(l) Further Assurances. From time to time, at another party's request and without further consideration (but at the requesting party's reasonable cost and expense), each party shall execute and deliver such additional documents and take all such further action as may be reasonably necessary to consummate the transactions contemplated by this Agreement.

(m) Counterparts; Facsimile. This Agreement may also be executed and delivered by facsimile signature or by email in portable document format in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

***[Remainder of Page Intentionally Left Blank; Signature Pages Follow]***

**IN WITNESS WHEREOF**, the parties have executed this Lock-Up Agreement as of the date first written above.

***Pubco:***

**[SWB HOLDINGS]**

By:_________________________________
Name:
Title:

***{Additional Signature on the Following Page}***

**IN WITNESS WHEREOF**, the parties have executed this Lock-Up Agreement as of the date first written above.

***Holder:***

Name of Holder: [___________________________]

By:________________________________________
Name:
Title:

***Number and Type of Company Units:***

Company Units:_____________________________________

____________________________________________________

***Address for Notice:***

Address:__________________________________________

____________________________________________________

____________________________________________________

Facsimile No.:______________________________________

Telephone No.:_____________________________________

Email:_____________________________________________

**FORM OF LOCK-UP AGREEMENT**

THIS LOCK-UP AGREEMENT (this "***Agreement***") is made and entered into as of [●], 2025 by and among (i) SWB Holdings, a Cayman Islands exempted company ("***Pubco***"), and (ii) the undersigned (the "***Holder***"). Any capitalized term used but not defined in this Agreement will have the meaning ascribed to such term in the BCA (defined below)

**[WHEREAS**, Pubco is a party to that certain Business Combination Agreement, dated as of [● ], 2025 (as amended from time to time in accordance with the terms thereof, the "***BCA***"), by and among (i) Soulpower Acquisition Corporation, an exempted company incorporated in the Cayman Islands with limited liability ("***SPAC***"), (ii) Pubco, (iii) [SPAC Merger Sub], a [Cayman Islands exempted company and a wholly-owned subsidiary of Pubco (*"**SPAC Merger Sub**"),* (iv) [Company Merger Sub], a Cayman Islands exempted company and a wholly-owned subsidiary of Pubco (*"**Company Merger Sub**")* and *(*v) the Company, pursuant to which, subject to the terms and conditions thereof, among other matters, (a) SPAC Merger Sub will merge with and into the SPAC, with the SPAC continuing as the surviving entity (the "***SPAC Merger***"), and with security holders of the SPAC receiving substantially equivalent securities of Pubco, and (b) Company Merger Sub will merge with and into the Company, with the Company continuing as the surviving entity (the "***Company Merger***", and together with the SPAC Merger, the "***Mergers***" and, collectively with the other transactions contemplated by the BCA, the "***Transactions***"), and with equity holders of the Company, including Holder, receiving [ordinary shares of Pubco], and as a result of which Mergers, among other matters, the SPAC and the Company will become wholly-owned subsidiaries of Pubco and Pubco will become a publicly traded company, all upon the terms and subject to the conditions set forth in the BCA and in accordance with the provisions of the applicable law;][1]

**WHEREAS**, immediately prior to the consummation of the Transactions (the "***Closing***"), Holder is a holder of the Company Units in such amounts as set forth underneath Holder's name on the signature page hereto; and

**WHEREAS**, pursuant to the BCA, and in view of the valuable consideration to be received by Holder thereunder, the parties desire to enter into this Agreement, pursuant to which the [merger consideration securities to be received by Holder] in the Transactions (all such securities, together with any securities paid as dividends or distributions with respect to such securities or into which such securities are exchanged or converted, the *"**Restricted Securities**"*) shall become subject to limitations on disposition as set forth herein.

**NOW, THEREFORE**, in consideration of the premises set forth above, which are incorporated in this Agreement as if fully set forth below, and intending to be legally bound hereby, the parties hereby agree as follows:

1. <u>Lock-Up Provisions</u>.

(a) Subject to Section 1(b), Holder hereby agrees not to, with respect to Restricted Securities, during the period commencing from the Closing and ending on the earlier of (x) [42 months] after the date of the Closing, and (y) the date after the Closing on which Pubco consummates a liquidation, merger, capital stock exchange, reorganization or other similar transaction with an unaffiliated third party that results in all of Pubco's stockholders having the right to exchange their equity holdings in Pubco for cash, securities or other property (such period, a "***Lock-Up Period***"): (i) lend, offer, pledge, hypothecate, encumber, donate, assign, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly

[1] Note to Draft: to be updated to conform to the description of the BCA.

or indirectly, any Restricted Securities, (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Restricted Securities, or (iii) publicly disclose the intention to do any of the foregoing, whether any such transaction described in clauses (i), (ii) or (iii) above is to be settled by delivery of Restricted Securities or other securities, in cash or otherwise (any of the foregoing described in clauses (i), (ii) or (iii), a "***Prohibited Transfer***"). The foregoing sentence shall not apply to the transfer or other disposition of any or all of the Restricted Securities owned by Holder (I) by gift, charitable contribution, will or intestate succession upon the death of Holder, (II) to any Permitted Transferee (defined below), (III) pursuant to a court order or settlement agreement related to the distribution of assets in connection with the dissolution of marriage or civil union or (IV) the establishment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of Restricted Securities; provided, that such plan does not provide for the transfer of Restricted Securities during the applicable Lock-Up Period; provided, however, that in any of cases (I), (II), (III) or (IV) it shall be a condition to such transfer that the transferee executes and delivers to Pubco an agreement stating that the transferee is receiving and holding the Restricted Securities subject to the provisions of this Agreement applicable to Holder, and there shall be no further transfer of such Restricted Securities except in accordance with this Agreement. As used in this Agreement, the term "***Permitted Transferee***" shall mean: (1) the members of Holder's immediate family (for purposes of this Agreement, "immediate family" shall mean with respect to any natural person, any of the following: such person's spouse or domestic partner, the siblings of such person and his or her spouse or domestic partner, and the direct descendants and ascendants (including adopted and step children and parents) of such person and his or her spouses or domestic partners and siblings), (2) any trust for the direct or indirect benefit of Holder or the immediate family of Holder, (3) if Holder is a trust, the trustor or beneficiary of such trust or the estate of a beneficiary of such trust, (4) if Holder is an entity, its partners, shareholders, members or owners of similar equity interests in Holder upon the liquidation and dissolution of Holder, or (5) any affiliate of Holder.

(b) Notwithstanding anything to the contrary contained herein, commencing on the second anniversary of the Closing date and continuing for a period of 18 months thereafter (such period, "***Leak-out Period***"), if the 10-day volume weighted average price of the Pubco Class A shares exceeds $16.00 per share, Holder may sell its Restricted Securities in an amount not to exceed 1/18th of its aggregate holdings of the Restricted Securities each calendar month. Such sales of Restricted Securities during the Leak-Out period shall be subject to a cap of 5% of the average daily trading volume of the Pubco Class A shares over the prior 10 trading days.

(c) Each of the Lock-Up Period and the Leak-Out Period shall be suspended if the closing price of the Pubco Class A shares exceeds $35.00 per share for two consecutive trading days, however, such restrictive periods will be reinstated if the price of the Pubco Class A shares falls below $35.00 per share for two consecutive trading days. Additionally, notwithstanding Section 1(a) and 1(b), if after the one year anniversary of the Closing date, the average monthly trading volume of the Pubco Class A shares is greater than 1,000,000 shares per day, then Holder shall be permitted to sell or otherwise transfer or dispose of an aggregate number of Pubco Class A shares up to 10% of the average monthly trading volume over any 30-day period; provided that the [closing price][2] of the Pubco Class A shares exceeds $16.00 per share at such time.

(d) If any Prohibited Transfer is made or attempted contrary to the provisions of this Agreement, such purported Prohibited Transfer shall be null and void ab initio, and Pubco shall refuse to recognize any such purported transferee of the Restricted Securities as one of its equity holders for any purpose. In order to enforce this <u>Section 1</u>, Pubco may impose stop-transfer instructions with respect to the Restricted Securities of Holder (and Permitted Transferees and assigns thereof) until the end of the Lock-Up Period.

[2] Note to Draft: Confirm whether this is the closing price of the VWAP.

(e) During the applicable Lock-Up Period, each certificate evidencing any Restricted Securities shall be stamped or otherwise imprinted with a legend in substantially the following form, in addition to any other applicable legends:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER SET FORTH IN A LOCK-UP AGREEMENT, DATED AS OF [●], 2025, BY AND AMONG THE ISSUER OF SUCH SECURITIES (THE "ISSUER"), AND THE ISSUER'S SECURITY HOLDER NAMED THEREIN, AS AMENDED. A COPY OF SUCH LOCK-UP AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE ISSUER TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(f) For the avoidance of any doubt, Holder shall retain all of its rights as a stockholder of Pubco during the applicable Lock-Up Period, including the right to vote any Restricted Securities and to receive any and all dividends or distributions.

2. Miscellaneous.

(a) Binding Effect; Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns. This Agreement and all obligations of Holder are personal to Holder and may not be transferred or delegated by Holder at any time. Pubco may freely assign any or all of its rights under this Agreement, in whole or in part, to any successor entity (whether by merger, consolidation, equity sale, asset sale or otherwise) without obtaining the consent or approval of Holder.

(b) Third Parties. Nothing contained in this Agreement or in any instrument or document executed by any party in connection with the transactions contemplated hereby shall create any rights in, or be deemed to have been executed for the benefit of, any person or entity that is not a party hereto or thereto or a successor or permitted assign of such a party.

(c) Governing Law; Jurisdiction. This Agreement and any dispute or controversy arising out of or relating to this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of law principles thereof. All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any state or federal court located in Delaware (or in any appellate courts thereof) (the "***Specified Courts***"). Each party hereto hereby (i) submits to the exclusive jurisdiction of any Specified Court for the purpose of any Action arising out of or relating to this Agreement brought by any party hereto and (ii) irrevocably waives, and agrees not to assert by way of motion, defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any Specified Court. Each party agrees that a final judgment in any Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each party irrevocably consents to the service of the summons and complaint and any other process in any other action or proceeding relating to the transactions contemplated by this Agreement, on behalf of itself, or its property, by personal delivery of copies of such process to such party at the applicable address set forth in Section 2(f). Nothing in this Section 2(c) shall affect the right of any party to serve legal process in any other manner permitted by applicable law.

(d) WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2(d).

(e) Interpretation. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement. In this Agreement, unless the context otherwise requires: (i) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa; (ii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding or succeeding such term and shall be deemed in each case to be followed by the words "without limitation"; (iii) the words "herein," "hereto," and "hereby" and other words of similar import in this Agreement shall be deemed in each case to refer to this Agreement as a whole and not to any particular section or other subdivision of this Agreement; and (iv) the term "or" means "and/or". The parties have participated jointly in the negotiation and drafting of this Agreement. Consequently, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(f) Notices. All notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered (i) in person, (ii) by facsimile or other electronic means, with affirmative confirmation of receipt, (iii) one Business Day after being sent, if sent by reputable, nationally recognized overnight courier service or (iv) three (3) Business Days after being mailed, if sent by registered or certified mail, pre-paid and return receipt requested, in each case to the applicable party at the following addresses (or at such other address for a party as shall be specified by like notice):

| | |
|---|---|
| *If to Pubco, to:*<br><br>[SWB Holdings]<br>[ ]<br><br>Attn: Justin Lafazan, CEO<br>Telephone No.: [ ]<br>E-mail: [ ] | *With a copy (which shall not constitute notice) to:*<br>[SPAC Counsel]<br>[ADDRESS]<br><br>and<br>Ellenoff Grossman & Schole LLP<br>1345 Avenue of the Americas, 11th Floor<br>New York, New York 10105<br>Attn: Matthew A. Gray, Esq., Esq.<br>Facsimile No.: (212) 370-7889<br>Telephone No.: (212) 370-1300<br>Email: mgray@egsllp.com |

*If to Holder, to*: the address set forth below Holder's name on the signature page to this Agreement.

(g) Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of Pubco, and Holder. No failure or delay by a party in exercising any right hereunder shall operate as a waiver thereof. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

(h) Authorization on Behalf of Pubco. The parties acknowledge and agree that notwithstanding anything to the contrary contained in this Agreement, any and all determinations, actions or other authorizations under this Agreement on behalf of Pubco after the Closing, including enforcing Pubco's rights and remedies under this Agreement, or providing any waivers or amendments with respect to the provisions hereof, shall solely be made, taken and authorized by the vote or consent of a majority of the Disinterested Directors. For purposes hereof, a "Disinterested Director" will mean an independent director disinterested in this Agreement or the BCA then serving on Buyer's board of directors. Without limiting the foregoing, in the event that Holder or Holder's Affiliate serves as a director, officer, employee or other authorized agent of Pubco or any of its current or future Affiliates, Holder and/or Holder's Affiliate shall have no authority, express or implied, to act or make any determination on behalf of Pubco or any of its current or future Affiliates in connection with this Agreement or any dispute or Action with respect hereto..

(i) Severability. In case any provision in this Agreement shall be held invalid, illegal or unenforceable in a jurisdiction, such provision shall be modified or deleted, as to the jurisdiction involved, only to the extent necessary to render the same valid, legal and enforceable, and the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby nor shall the validity, legality or enforceability of such provision be affected thereby in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties will substitute for any invalid, illegal or unenforceable provision a suitable and equitable provision that carries out, so far as may be valid, legal and enforceable, the intent and purpose of such invalid, illegal or unenforceable provision.

(j) Specific Performance. Holder acknowledges that its obligations under this Agreement are unique, recognizes and affirms that in the event of a breach of this Agreement by Holder, money damages will be inadequate and Pubco will have no adequate remedy at law, and agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by Holder in accordance with their specific terms or were otherwise breached. Accordingly, Pubco shall be entitled to seek an injunction or restraining order to prevent breaches of this Agreement by Holder and to enforce specifically the terms and provisions hereof, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such party may be entitled under this Agreement, at law or in equity.

(k) Entire Agreement. This Agreement constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled; provided, that, for the avoidance of doubt, the foregoing shall not affect the rights and obligations of the parties under the BCA or any Ancillary Document. Notwithstanding the foregoing, nothing in this Agreement shall limit any of the rights or remedies of Pubco or any of the obligations of Holder under any other agreement between Holder and Pubco or any certificate or instrument executed by Holder in favor of Pubco, and

nothing in any other agreement, certificate or instrument shall limit any of the rights or remedies of Pubco or any of the obligations of Holder under this Agreement.

(l) Further Assurances. From time to time, at another party's request and without further consideration (but at the requesting party's reasonable cost and expense), each party shall execute and deliver such additional documents and take all such further action as may be reasonably necessary to consummate the transactions contemplated by this Agreement.

(m) Counterparts; Facsimile. This Agreement may also be executed and delivered by facsimile signature or by email in portable document format in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

***[Remainder of Page Intentionally Left Blank; Signature Pages Follow]***

**IN WITNESS WHEREOF**, the parties have executed this Lock-Up Agreement as of the date first written above.

***Pubco:***

**[SWB HOLDINGS]**

By:________________________________
Name:
Title:

***{Additional Signature on the Following Page}***

**IN WITNESS WHEREOF**, the parties have executed this Lock-Up Agreement as of the date first written above.

***Holder:***

Name of Holder: [____________________________]

By:________________________________________
Name:
Title:

***Number and Type of Company Units:***

Company Units:________________________________________

______________________________________________________

***Address for Notice:***

Address:______________________________________________

______________________________________________________

______________________________________________________

Facsimile No.:_________________________________________

Telephone No.:________________________________________

Email:________________________________________________

# ITEM 4

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5



CohnReznick



# CONTENDER DEVELOPMENT, INC.

## CALCULATED VALUE OF BUSINESS ENTERPRISE OF NEWCO

As of September 3, 2025

Report Date: October 2, 2025

PRIVATE & CONFIDENTIAL
Information contained herein is intended solely for the information and internal use of Contender Development, Inc., and is not intended to be and should not be used by any other person or entity. No other person or entity is entitled to rely, in any manner, or for any purpose, on this report.

A member of Nexia International

CohnReznick is an independent member of Nexia International

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

CohnReznick

**October 2, 2025**

Mr. David Feingold
Contender Development, Inc.
5 Century Dr Ste 210
Greenville, SC 29607

Dear Mr. Feingold:

We performed a calculation engagement[1] which consisted of certain calculation procedures on behalf of **Contender Development, Inc.** (the "Client") to calculate the value of business enterprise (the "Subject Interest") of **NewCo** (the "Company") as of **September 3, 2025** (the "Calculation Date"). The calculation procedures were performed solely for management strategic planning purposes. The calculation is to be used for the aforementioned purpose and may not be distributed or used for any other purpose without the express written consent of CohnReznick Advisory LLC ("CohnReznick").

This report complies with the reporting requirements set forth by the Statements on Standards for Valuation Services ("SSVS") of the American Institute of Certified Public Accountants ("AICPA") for a calculation report. Supporting documentation concerning the data, reasoning, and analysis has been retained as part of our work papers. The attached report describes the information considered and calculation procedures. The report also sets forth all of the special considerations, assumptions, and limiting conditions relevant to the issue.

In a calculation engagement, the valuation analyst and the client agree on the specific valuation approaches and valuation methods the valuation analyst will use and the extent of valuation procedures the valuation analyst will perform to estimate the value of the subject interest. A calculation engagement does not include all of the procedures required in a valuation engagement, as that term is defined in the SSVS. Had a valuation engagement been performed, the results might have been different.

Based on our calculations, as described in this report, which are based solely on the procedures agreed upon as previously referred to, the resulting calculated value of the Subject Interest ranges from **$487 million to $5,377 million** as of the Calculation Date.

This calculated value is subject to the Valuation Assumptions and Limiting Conditions and the valuation analyst's certification included in Appendix IV and Appendix II, respectively, and the assumption that there are no undisclosed facts or circumstances that would materially affect our calculation. We have no obligation to update this report or our calculation of value for information that comes to our attention after the date of this report.

If you have any questions regarding these matters, please call us.

Very truly yours,

CohnReznick Advisory LLC

Anthony Doughty

Anthony Doughty, CFA
Principal

Joice Pharris

Joice Pharris, ABV
Director

[1] The term "calculation engagement" is defined in the Statements on Standards for Valuation Services ("SSVS") of the American Institute of Certified Public Accountants ("AICPA")

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# TABLE OF CONTENTS


| | |
|---|---|
| OBJECTIVE AND PURPOSE | 4 |
| APPROACH | 5 |
| THE COMPANY | 6 |
| VALUATION APPROACHES | 7 |
| VALUATION METHODOLOGY | 8 |

| | |
|---|---|
| FINANCIAL AND VALUATION EXHIBITS | APPENDIX I |
| VALUATION CERTIFICATION | APPENDIX II |
| ANALYST QUALIFICATIONS | APPENDIX III |
| VALUATION ASSUMPTIONS AND LIMITING CONDITIONS | APPENDIX IV |

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# OBJECTIVE AND PURPOSE

| | |
|---|---|
| **Objective and Purpose** | • We performed a calculation engagement which consisted of certain calculation procedures on behalf of Contender Development, Inc. (the "Client") to calculate the value of business enterprise (the "Subject Interest") of NewCo (the "Company") as of September 3, 2025 (the "Calculation Date"). The calculation procedures were performed solely for management strategic planning purposes. The calculation is to be used for the aforementioned purpose and may not be distributed or used for any other purpose without the express written consent of CohnReznick Advisory LLC ("CohnReznick").<br>• This report complies with the reporting requirements set forth by the Statements on Standards for Valuation Services ("SSVS") of the American Institute of Certified Public Accountants ("AICPA") for a calculation report. Supporting documentation concerning the data, reasoning, and analysis has been retained as part of our work papers. The attached report describes the information considered and calculation procedures. The report also sets forth all of the special considerations, assumptions, and limiting conditions relevant to the issue.<br>• In a calculation engagement, the valuation analyst and the client agree on the specific valuation approaches and valuation methods the valuation analyst will use and the extent of valuation procedures the valuation analyst will perform to estimate the value of the subject interest. A calculation engagement does not include all of the procedures required in a valuation engagement, as that term is defined in the SSVS. Had a valuation engagement been performed, the results might have been different. |
| **Standard of Value** | • For purposes of our calculation, fair market value is defined as follows:<br>*"The price at which the property would change hands between a willing buying and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."* |
| **Premise of Value** | • Our calculated value is based on a going concern premise. The going concern premise assumes that the assets in continued use as part of a business enterprise represent the highest and best use of the assets. |
| **Limitations** | • Although our calculation is intended to estimate enterprise value, our valuation does not address the underlying fairness of any proposed transaction. Our valuation does not address the underlying business decisions to affect any transactions of the seller or buyer, the effects thereof, or any other matters. CohnReznick assumes no responsibility for a seller or buyer's inability to obtain a contract using our calculated value. |

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# APPROACH

- We have analyzed both internal and external factors that influence value. Internal factors include the history, operations, historical and expected economic earnings and dividends/distributions to owners, and overall financial position. External factors include the economic and capital market outlooks, the outlook for the industry, and the competitive environment. Additionally, we considered factors related to the obligations, rights of control, marketability, and overall level of risk inherent in ownership.
- In addition to analyzing financial and other data provided, our procedures included discussions with Client and Company management ("Management") concerning the prospects and operating performance of the business. Companies in similar industries were also researched and analyzed. Other such independent analysis and research were also performed by us to the extent we deemed necessary.
- In performing our calculation, we relied upon information provided by Management, the owners, and other third parties without independent verification. We did not audit, compile, or review the forecasts or other data, and we do not express an opinion or any form of assurance on this information. We performed such research and analysis, examination of documents, and inquiries as we judged necessary in the circumstances. Significant sources of information relied upon are detailed in the footnotes to the financial and valuation schedules.
- Our calculation contemplates facts and circumstances that exist or are foreseeable on the Calculation Date. Events and circumstances occurring subsequent to the Valuation Date have not been considered in our analysis. Accordingly, our estimate of value is valid only as of the Calculation Date.

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# THE COMPANY

## Company Overview

- Contender Development, Inc. specializes in real estate development across multiple asset classes, including residential, multifamily, hospitality, and recreational properties. Contender Development's portfolio includes both completed and ongoing projects, with several supported by formal appraisals and market transactions.

- Contender Development is forming a new entity as of the Calculation Date, NewCo, for the purposes of holding and developing certain new projects.

## Organization

- Contender Development, Inc. was organized on September 10, 2021, in the State of Delaware as a for-profit corporation and began operations in 2021.
- There have been no reported transactions in or offers to acquire the Company's equity within the previous 3 years.

## Operations

NewCo is expected to develop projects across North Carolina, South Carolina and Tennessee. A detail of the projects location, sizes and expected revenue is shown in **Exhibit A.7.**

## Risk to Business

- Market & Economic Risks: Exposure to interest rate fluctuations, inflation, and cyclical housing demand can impact project feasibility and absorption rates.
- Regulatory & Operational Risks: Complex zoning laws, environmental compliance, permitting delays, and construction challenges (labor shortages, supply chain issues) increase costs and timelines.
- Financial & Strategic Risks: High leverage, long development cycles, and geographic concentration create liquidity pressures, while community opposition and policy changes add uncertainty.



CohnReznick

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# VALUATION APPROACHES

## Description

We agreed with the Client on the approaches and valuation methods to estimate the value of the subject interest. Valuation methods can generally be aggregated into the following three approaches:

- **Asset Approach** - The asset approach is a general way of determining the value of a business using one or more methods based on the value of the underlying assets and liabilities of the business. The premise of value (going concern versus liquidation) is a critical element in determining which method to use under the asset approach.
  - **Adjusted Net Asset Value ("NAV") Method** – This method is based upon the principal that the value of the equity in a business is equal the fair market value of its assets less the fair market value of its liabilities.
- **Income Approach** - The income approach is predicated on the value of future cash flows that the business will generate over its remaining expected life.
  - **Capitalization of Earnings ("COE") Method** - This method is most appropriate when a company is expected to have stable and predictable annual growth rate in future economic earnings.
  - **Discounted Cash Flow ("DCF") Method** - This method is based on the fundamental financial premise that the value of any investment is the present value of the investment's expected future cash flows and is more appropriate to use when future earnings or cash flow are expected to vary from historical or stable operations.
- **Market Approach** - The market approach is predicated on the theory that the value of the company reflects the price at which comparable companies are purchased under similar circumstances.
  - **Comparative Transactions ("CT") Method** - This method is based upon a comparison of the Company to market transactions for similar companies. The comparative transactions approach estimates enterprise value through an analysis of recent sales or offerings of comparable businesses. The reliability of this technique is dependent upon the availability of sales and earnings data for similar companies.
  - **Guideline Public Company ("GPC") Method –** This method provides an indication of value whereby market multiples are derived from market prices of stocks of companies that are engaged in the same or similar lines of business and that are actively traded on a free and open market. The reliability of this technique is dependent on whether or not same or similar companies can be identified, as well as availability of data.

## Application of Valuation Methodology

- In our calculation we have used the COE Method (an income-based approach), the CT Method, and the GPC Method (market-based approaches).
- The application of the income and market approaches rely on the financial forecasts for fiscal year 2026 provided by Management. We did not audit, review, or modify the forecasts or other data provided by Management, and we will not express an opinion or any form of assurance on this data. We did not conduct any independent study or investigation as to the accuracy or completeness of the forecast information.
- In this report, we consider but do not apply the NAV Method because it does not capture the value of intangible assets in a well-established operating company unless significant adjustments and assumptions are made and is, therefore, a less-reliable indication of value than any method under the income approach or market approach.

# VALUATION METHODOLOGY

## Income Approach

- The COE Method is based on the principle that the value of the business can be estimated by the future benefits received from ownership of the business. This method of valuation assumes that the current value of the Company is appropriately measured by the near-term expected performance of the Company. Performance is measured by debt-free cash flow, which represents the cash flow available for all invested capital, both debt and equity.
- The application of the Capitalization of Earnings Method is presented in **Exhibit A.2**. The weighted average cash flow is capitalized at the capitalization rate based on the weighted average cost of capital ("WACC") derived for this analysis less a perpetual growth rate.
- A number of adjustments must be made to income to develop a true measure of discretionary cash flow. Non-cash depreciation and amortization expenses are added to debt-free net income. A reduction to the after-tax cash flows is made for capital expenditures. These capital expenditures include those required to maintain expected operations.
- With increasing sales, an incremental investment by the company is required in the net working capital, which is comprised primarily of inventory and accounts receivable. This required increase in working capital is subtracted from cash flows to derive cash-free, debt-free net cash flow, which is then capitalized.
- We estimated a WACC range from 9.75% to 15.75% with a mid-point of 12.75% utilizing market inputs and a capitalized asset pricing method ("CAPM"). The mid-point assumes a company-specific risk premium of 5.0%, as shown in **Exhibit A.3**.
- A perpetual growth rate range was assumed from 2% to 4%, in line with the expected inflation and industry growth rates.
- Based on the inputs above, the calculated range of enterprise values from the income approach is **$890 million to $2,040 million** as of the Calculation Date.

## Market Approach

### Guideline Public Company ("GPC") Method

- Based on the facts and circumstances and our financial analyses, we have determined that the GPC Method is an appropriate market-based approach to estimate the value of the Company.
- To be comparable, it is not necessary that the company and publicly traded companies be identical. It is rare to find a company that matches the company being valued. However, to achieve a meaningful comparison, it is best if the guideline public companies:
  - Be in the same or similar line of business as the Company
  - Have a similar competitive position within the industry as the Company
  - Have similar rates of historical growth as the Company
  - Have similar historical and current levels of profitability as the Company
  - Have a similar capital structure as the Company
  - Be of a similar size in terms of revenues and assets as the Company
- However, due to differences in size and liquidity of the investment, the imperfect nature of the market for publicly traded stocks, and differences in the nature of the products or markets served by each company, the judgment of the appraisers is required to make comparisons and relations.
- Based on discussions with Management, as well as independent searches using the CapitalIQ database, while there are no directly comparable publicly traded companies, the companies below were identified as similar and/or competitors in the Company's industry. Management indicated the first two are the closest comparable companies.

  1. Forestar Group Inc. (NYSE:FOR)
  2. Millrose Properties, Inc. (NYSE:MRP)
  3. Five Point Holdings, LLC (NYSE:FPH)
  4. Green Brick Partners, Inc. (NYSE:GRBK)
  5. M/I Homes, Inc. (NYSE:MHO)
  6. LGI Homes, Inc. (NasdaqGS:LGIH)
  7. Howard Hughes Holdings Inc. (NYSE:HHH)

# VALUATION METHODOLOGY

- The GPC Method multiples were applied to the forward-looking revenue for fiscal year ("FY") 2026 based on consideration of growth, margins, and operations between the subject company and the guideline public companies. The EBITDA multiples were considered but not utilized since transactions in this industry are usually measured in terms of revenue multiples.
- In developing the calculated ranges of enterprise value, we considered the following ranges of multiples (***Exhibit A.5***):
  - The range of last fiscal year ("LFY") revenue multiples from all the guideline public companies is 0.9x to 8.4x.
  - The observed range of latest twelve months ("LTM") revenue multiples from the 25th percentile to the 75th percentile is 1.4x to 7.3x
  - The range of forward-looking revenue multiples over the last two years for Forestar Group, Inc. ranges from 0.95x to 1.45x
  - The range of forward-looking revenue multiples for the trading history (2-months) of Millrose Properties, Inc ranges from 6.21x to 9.94x
- Based on the inputs above, the calculated range of enterprise values from the GPC method is **$487 million to $5,377 million** as of the Calculation Date.

**Comparative Transactions Method**

- The CT Method uses information from the sale or purchase of private businesses as a guide to indicate value for the subject company. Adjustments are made to account for differences in the nature and condition of the business and the durability of the income stream.
- We identified a group of thirteen comparable transactions with closing dates from 2017 to 2024 and ranges of enterprise value from $93 million to $6,592 million (***Exhibit A.6.***).
- The observed range of latest twelve months ("LTM") revenue multiples from the comparable transactions is 1.1x to 3.8x.
- Based on the inputs above, the calculated range of enterprise values from the comparable transactions method is **$595 million to $784 million** as of the Calculation Date.

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5




CohnReznick

# APPENDIX I
# FINANCIAL AND VALUATION EXHIBITS

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.1

**Contender Development, Inc.**
As of September 3, 2025

## Calculated Enterprise Value of NewCo

***(in USD Millions)***




***Footnote:***

LFY = Last Fiscal Year. LTM = Latest Twelve Months. FY1 = 12/31/2025.

This illustrates the range of potential values using the revenue multiples derived from guideline public companies and comparative transactions. It is intended solely to present a comparative range and does not represent the Fair Market Value

(1) Range of all guideline companies multiples in the last fiscal year does not include Millrose Properties, Inc. which began trading in 2025.

(2) Multiples represent a range of forward multiples for the last two years for Forestar Group, Inc., and for the trading history of Millrose Properties, Inc.

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.2

**Contender Development, Inc.**
As of September 3, 2025

## Capitalization of Earnings (COE) Method

| (in USD Thousands) | | Projected FYE 12/31/2025 | FYE 12/31/2026 | Total |
|---|---|---|---|---|
| Revenues | | $ - | $ 540,913 | |
| *growth %* | | *na* | *na* | |
| Cost of goods sold | | - | - | |
| **Gross profit** | | **-** | **540,913** | |
| *Gross profit margin %* | | *na* | *100.0%* | |
| Operating expenses | | - | 384,049 | |
| **EBITDA** | | **-** | **156,865** | |
| *EBITDA margin %* | | *na* | *29.0%* | |
| **Selected weighting** | (1) | *0%* | *100%* | *100%* |

| | | | |
|---|---|---|---|
| Weighted average revenue | | | *540,913* |
| Weighted average Adjusted EBITDA | | | *156,865* |
| Tax depreciation | | | 1,082 |
| **Income before taxes** | | | 155,783 |
| Income taxes | **26.00%** | | 40,504 |
| **Net operating income** | | | **115,279** |
| ( + ) Tax depreciation | | | 1,082 |
| ( - ) Capital expenditures | | (4) | (1,082) |
| ( ± ) Changes in net working capital | | | (2,596) |
| **Projected cash flow** | | | **112,683** |
| x Capitalization factor | | | 10.89 |
| **PV of net available cash flows** | | | **1,227,192** |

| | |
|---|---|
| **Business Enterprise Value (BEV) (Rounded)** | **1,230,000** |

### Capitalization factor

| | | |
|---|---|---|
| WACC | | 12.75% |
| Less: Long-term growth rate | (2) | 3.00% |
| Capitalization rate | | 9.8% |
| Midpoint convention | (3) | 1.062 |
| Concluded capitalization factor | | 10.891 |

### Implied BEV Multiples

| Metric | FY2 |
|---|---|
| *BEV / Revenue* | *2.3x* |
| *BEV / EBITDA* | *7.8x* |

### Sensitivity Analysis - Business Enterprise Value (BEV) (Rounded)

| Discount Rate \ Terminal Growth Rate | 2.00% | 2.50% | 3.00% | 3.50% | 4.00% |
|---|---|---|---|---|---|
| **9.75%** | 1,530,000 | 1,630,000 | 1,750,000 | 1,880,000 | 2,040,000 |
| **11.25%** | 1,290,000 | 1,360,000 | 1,440,000 | 1,530,000 | 1,630,000 |
| **12.75%** | 1,120,000 | 1,170,000 | 1,230,000 | 1,290,000 | 1,360,000 |
| **14.25%** | 990,000 | 1,030,000 | 1,070,000 | 1,120,000 | 1,170,000 |
| **15.75%** | 890,000 | 920,000 | 950,000 | 990,000 | 1,020,000 |

***Footnotes:***

EBITDA = Earnings Before Interest, Taxes, Depreciation & Amortization. PV = Present Value. BEV = Business Enterprise Value. Source: Management. Some numbers may not add due to rounding. na = not applicable, nm = not meaningful

(1) Selected weighting based on FYE 2026 being representative of the Company's normalized level of operations.

(2) Source: Long-term growth estimated based on the June 2025 Livingston Survey; IBISWorld Industry report on Land Development in the US.

(3) Adjustment to capitalization rate for the midpoint convention, which assumes cash flows are received throughout the year. Calculation is (1 + WACC)^0.5

(4) Capital expenditures were selected based on the median of guideline public companies, please refer to Exhibit B.3.

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.3

**Contender Development, Inc.**
As of September 3, 2025

## Weighted Average Cost of Capital (WACC)

| Cost of Equity - CAPM | | | |
|---|---|---|---|
| Risk-free rate | | 4.85% | Based on the 20-year Treasury Bond rate as of 09/03/25 (Source: S&P Capital IQ) |
| Equity risk premium | 5.00% | | Kroll recommended U.S. equity risk premium. |
| Beta | 1.01 | | Equal to the relevered beta. Refer to Exhibit A.4 for more detail |
| Market premium | | 5.06% | Equal to equity risk premium x beta |
| Size premium | | 1.19% | Based on the historical return of small capitalization stocks in the 7th decile (Source: Kroll, 2025) |
| Company-specific risk premium | | 5.00% | Reflects uncertainty of the forecast and lack of geographic diversification in comparison to guideline public companies. |
| **Cost of equity** | | **16.10%** | Equal to the risk-free rate + market premium + size premium + unsystematic risk premium |

| Cost of Debt | | |
|---|---|---|
| Cost of debt before tax | 7.13% | Based on BB-rated corporate bonds (Source: S&P Capital IQ) |
| Tax rate | 26.00% | Equal to the estimated blended federal and state corporate tax rate |
| **Cost of debt** | **5.28%** | Equal to the cost of debt before tax x (1 - tax rate) |

| Capital Structure | | |
|---|---|---|
| Equity weight | 70.00% | Refer to Exhibit A.4 for more detail |
| Debt weight | 30.00% | Refer to Exhibit A.4 for more detail |

| WACC | Rate | x | Weight | = | Wtd. Rate | |
|---|---|---|---|---|---|---|
| Cost of equity | 16.10% | | 70.0% | | 11.27% | Equal to the cost of equity x the equity weight in the capital structure |
| Cost of debt | 5.28% | | 30.00% | | 1.58% | Equal to cost of debt x the debt weight in the capital structure |
| **WACC** | | | | | **12.75%** | Equal to cost of equity + cost of debt (rounded to the nearest 0.25%) |

***Footnotes:***
CAPM = Capital Asset Pricing Model. WACC = Weighted Average Cost of Capital.

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.4

**Contender Development, Inc.**
As of September 3, 2025

## Weighted Average Cost of Capital (WACC)

| Guideline company | LTM Debt % | LTM Equity % | LTM D/E ratio | Marginal tax rate | Levered beta | Period (years) | Frequency | Unlevered beta |
|---|---|---|---|---|---|---|---|---|
| | (1) | (1) | | | (2) | (3) | (3) | (4) |
| Forestar Group Inc. | 38.5% | 61.5% | 0.63 | 24.3% | 0.86 | 2 | Weekly | 0.67 |
| Millrose Properties, Inc. | 15.2% | 84.8% | 0.18 | 16.0% | na | 2 | Weekly | na |
| Five Point Holdings, LLC | 24.1% | 75.9% | 0.32 | 13.5% | 0.90 | 2 | Weekly | 0.28 |
| Green Brick Partners, Inc. | 8.5% | 91.5% | 0.09 | 19.2% | 1.12 | 2 | Weekly | 0.97 |
| M/I Homes, Inc. | 19.9% | 80.1% | 0.25 | 23.1% | 1.06 | 2 | Weekly | 0.88 |
| LGI Homes, Inc. | 54.7% | 45.3% | 1.21 | 24.5% | 1.32 | 2 | Weekly | 0.87 |
| Howard Hughes Holdings Inc. | 53.1% | 46.9% | 1.13 | 22.0% | 1.03 | 2 | Weekly | 0.51 |
| ***Summary:*** | | | | | | | | |
| Low | 8.5% | 45.3% | 0.09 | 13.5% | 0.86 | | | 0.28 |
| Lower quartile | 17.5% | 54.2% | 0.21 | 23.7% | 0.93 | | | 0.55 |
| Average | 30.6% | 69.4% | 0.54 | 23.9% | 1.05 | | | 0.70 |
| Median | 24.1% | 75.9% | 0.32 | 26.0% | 1.04 | | | 0.77 |
| Upper quartile | 45.8% | 82.5% | 0.88 | 26.0% | 1.11 | | | 0.87 |
| High | 54.7% | 91.5% | 1.21 | 26.0% | 1.32 | | | 0.97 |

| Capital structure | | |
|---|---|---|
| Selected debt weight | 30.0% | Equal to the median debt % of the guideline public companies, rounded to the nearest 5% percent |
| Selected equity weight | 70.0% | Equal to (1 - selected debt weight) |
| **D/E ratio** | **0.43** | Equal to debt weight ÷ equity weight |

| Beta | | |
|---|---|---|
| Selected unlevered beta | 0.77 | Equal to the median unlevered beta of the guideline public companies |
| Tax rate | 26.0% | Equal to the estimated blended federal and state corporate tax rate |
| **Relevered beta** | **1.01** | Equal to selected unlevered beta × (1 + (1 - tax rate) × D/E ratio) |

***Footnotes:***

TIC = Total Invested Capital. LTM = Last Twelve Months. D/E = Debt-to-Equity. Source: Guideline company data downloaded from S&P Capital IQ. na = not applicable, nm = not meaningful

(1) Book value of debt is used as an approximation of market value. For purposes of calculating capital structure, any preferred equity or minority interest is added to equity.

(2) Calculated based on stock prices for the specified period & frequency in (3), regressed using the country indice where the respective guideline public company stock trades.

(3) Represents the number of years and frequency (weekly or monthly) used in selecting stock prices for the levered beta calculation of guideline public companies.

(4) Unlevered beta = Levered beta ÷ (1 + (1 - tax rate) × D/E ratio).Furthermore, the betas were adjusted using the simplified Marshall Blume formula (2/3 × Levered Beta + 1/3), on the basis that in the long-term observed betas have a tendency to mean revert to 1.0 (i.e., same risk as the economy).

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.5

Market Approach -- Guideline Public Company Method

**Contender Development, Inc.**
As of September 3, 2025

| (in USD Millions, except Share Price) | Summary Statistics from Guideline Companies | | | | | | Forestar Group Inc. | Millrose Properties, Inc. | Five Point Holdings, LLC | Green Brick Partners, Inc. | M/I Homes, Inc. | LGI Homes, Inc. | Howard Hughes Holdings Inc. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Low | 25th Percentile | Average | Median | 75th Percentile | High | NYSE:FOR | NYSE:MRP | NYSE:FPH | NYSE:GRBK | NYSE:MHO | NasdaqGS:LGIH | NYSE:HHH |
| **Market Valuation** | | | | | | | | | | | | | |
| Share price | | | | | | | $27.45 | $34.55 | $5.59 | $69.30 | $148.30 | $62.63 | $76.53 |
| Market capitalization | 391 | 1,420 | 2,921 | 3,019 | 4,230 | 5,735 | 1,395 | 5,735 | 391 | 3,019 | 3,914 | 1,444 | 4,546 |
| Enterprise value | 1,995 | 2,603 | 4,184 | 3,283 | 5,386 | 8,034 | 2,080 | 6,693 | 1,995 | 3,283 | 4,079 | 3,125 | 8,034 |
| **Valuation Multiples** | | | | | | | | | | | | | |
| EV / LFY revenue | 0.9x | 1.4x | 3.0x | 1.5x | 3.8x | 8.4x | 1.4x | na | 8.4x | 1.6x | 0.9x | 1.4x | 4.6x |
| EV / LTM revenue | 0.9x | 1.4x | 7.0x | 1.5x | 7.3x | 28.9x | 1.3x | 28.9x | 10.1x | 1.5x | 0.9x | 1.5x | 4.5x |
| EV / FY1 revenue | 0.9x | 1.4x | 3.9x | 1.7x | 4.7x | 11.9x | 1.3x | 11.9x | na | 1.7x | 0.9x | 1.7x | 5.7x |
| EV / FY2 revenue | 0.9x | 1.3x | 3.2x | 1.5x | 4.0x | 9.0x | 1.2x | 9.0x | na | 1.6x | 0.9x | 1.5x | 4.8x |
| EV / LFY EBITDA | 5.8x | 7.2x | 11.6x | 9.9x | 13.5x | 22.9x | 8.5x | na | 22.9x | 6.8x | 5.8x | 14.3x | 11.2x |
| EV / LTM EBITDA | 6.3x | 7.9x | 17.0x | 10.6x | 16.3x | 48.9x | 10.1x | na | 48.9x | 7.1x | 6.3x | 18.1x | 11.2x |
| EV / FY1 EBITDA | 6.4x | 10.9x | 14.2x | 14.8x | 17.3x | 21.6x | 10.9x | 14.8x | na | na | 6.4x | 21.6x | 17.3x |
| EV / FY2 EBITDA | 6.4x | 9.8x | 11.5x | 11.0x | 13.6x | 16.6x | 9.8x | 11.0x | na | na | 6.4x | 16.6x | 13.6x |
| **Financials** | | | | | | | | | | | | | |
| LFY revenue | 238 | 1,570 | 2,051 | 1,925 | 2,177 | 4,505 | 1,509 | na | 238 | 2,099 | 4,505 | 2,203 | 1,751 |
| LTM revenue | 197 | 888 | 1,773 | 1,771 | 2,091 | 4,487 | 1,543 | 232 | 197 | 2,138 | 4,487 | 2,044 | 1,771 |
| NTM revenue | 689 | 1,565 | 1,993 | 1,702 | 1,866 | 4,426 | 1,610 | 689 | na | 1,889 | 4,426 | 1,794 | 1,550 |
| FY1 revenue | 564 | 1,451 | 1,960 | 1,668 | 1,933 | 4,458 | 1,546 | 564 | na | 1,981 | 4,458 | 1,790 | 1,420 |
| FY2 revenue | 743 | 1,674 | 2,110 | 1,864 | 2,078 | 4,431 | 1,672 | 743 | na | 2,088 | 4,431 | 2,047 | 1,680 |
| LFY EBITDA | 87 | 225 | 409 | 363 | 651 | 717 | 244 | na | 87 | 482 | 708 | 219 | 717 |
| LTM EBITDA | 41 | 181 | 374 | 333 | 599 | 720 | 205 | na | 41 | 461 | 646 | 173 | 720 |
| FY1 EBITDA | 145 | 190 | 378 | 452 | 464 | 638 | 190 | 452 | na | na | 638 | 145 | 464 |
| FY2 EBITDA | 189 | 213 | 448 | 591 | 608 | 639 | 213 | 608 | na | na | 639 | 189 | 591 |
| **Growth** | | | | | | | | | | | | | |
| LTM revenue growth | -19.7% | -5.3% | 9.7% | 4.9% | 12.3% | 62.0% | 2.4% | na | -19.7% | 13.9% | 7.5% | -7.9% | 62.0% |
| FY1 to FY2 revenue CAGR | -0.6% | 6.1% | 12.9% | 11.2% | 17.3% | 31.9% | 8.1% | 31.9% | na | 5.4% | -0.6% | 14.4% | 18.3% |
| LTM EBITDA growth | -49.3% | -22.7% | 2.5% | -7.4% | 7.2% | 94.8% | -12.0% | na | -49.3% | 10.5% | -2.9% | -26.3% | 94.8% |
| FY1 to FY2 EBITDA CAGR | 0.2% | 12.1% | 20.9% | 27.3% | 30.4% | 34.6% | 12.1% | 34.6% | na | na | 0.2% | 30.4% | 27.3% |
| **Profitability** | | | | | | | | | | | | | |
| LTM gross margin | 22.4% | 24.3% | 39.8% | 32.2% | 45.1% | 85.3% | 22.4% | 85.3% | 44.5% | 32.2% | 25.2% | 23.4% | 45.8% |
| FY1 gross margin | 21.7% | 22.2% | 29.7% | 24.9% | 30.4% | 49.5% | 21.7% | na | na | 30.4% | 24.9% | 22.2% | 49.5% |
| FY2 gross margin | 22.4% | 22.4% | 27.7% | 24.5% | 29.8% | 39.4% | 22.4% | na | na | 29.8% | 24.5% | 22.4% | 39.4% |
| LTM EBITDA margin | 8.5% | 13.6% | 19.8% | 17.5% | 21.3% | 40.7% | 13.3% | na | 20.6% | 21.6% | 14.4% | 8.5% | 40.7% |
| FY1 EBITDA margin | 8.1% | 12.3% | 29.5% | 14.3% | 32.7% | 80.2% | 12.3% | 80.2% | na | na | 14.3% | 8.1% | 32.7% |
| FY2 EBITDA margin | 9.2% | 12.7% | 30.7% | 14.4% | 35.2% | 81.8% | 12.7% | 81.8% | na | na | 14.4% | 9.2% | 35.2% |

Source: S&P Capital IQ. na = not applicable, nm = not meaningful

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.6

**Contender Development, Inc.**
As of September 3, 2025

## Comparative Transaction Multiples

*(in USD Thousands)*

| Sale Date | Target Name | Target Description | Acquirer Name | Revenue | EBITDA | EBITDA Margin % | Enterprise Value | EV / Revenue | EV / EBITDA |
|---|---|---|---|---|---|---|---|---|---|
| 8/21/2024 | Redrow plc | Redrow plc focuses on housebuilding activities in the United Kingdom. It is involved in acquiring, developing, and reselling land; developing and selling residential housing properties; and business park maintenance services. Redrow plc was founded in 1974 and is based in Flintshire, the United Kingdom. As of August 21, 2024, Redrow plc operates as a subsidiary of Barratt Developments plc. | Barratt Developments plc (nka:Barratt Redrow plc) | 2,337,877 | 367,345 | 15.7% | 3,081,392 | 1.3x | 8.4x |
| 4/19/2024 | Sekisui House U.S., Inc. | Sekisui House U.S., Inc., together with its subsidiaries, engages in the homebuilding and financial service businesses. Its homebuilding operations include purchasing finished lots or developing lots for the construction and sale primarily of single-family detached homes to first-time and first-time move-up homebuyers under the Richmond American Homes name. The company conducts its homebuilding operations in Arizona, California, Nevada, New Mexico, Oregon, Texas, Washington, Colorado, Idaho, Utah, Alabama, Florida, Maryland, Pennsylvania, Tennessee, and Virginia. Its financial services operations comprise originating mortgage loans primarily for homebuyers; providing insurance coverage primarily to its homebuilding subsidiaries and subcontractors for homes sold by its homebuilding subsidiaries, and for work performed in completed subdivisions; acting as a re-insurer on the claims; selling third-party personal property and casualty insurance products to homebuyers; and offering title agency services. The company was formerly known M.D.C. Holdings, Inc. The company was founded in 1972 and is headquartered in Denver, Colorado. M.D.C. Holdings, Inc. operates as a subsidiary of SH Services, LLC. | SH Residential Holdings, LLC | 4,642,877 | 515,487 | 11.1% | 5,159,397 | 1.1x | 10.0x |
| 4/19/2024 | M.D.C. Holdings, Inc. | M.D.C. Holdings, Inc. is an American holding company that operates home construction, mortgage, insurance, and title companies. The company focuses on single-family and residential communities via its Richmond American Homes brand in Arizona, California, Colorado, Florida, Virginia, Nevada, Utah, and Washington. M.D.C. Holdings constructs homes for first-time and move-up homebuyers. The company segments include Homebuilding and Financial Services. Its Home construction in Colorado, California, Washington, and Arizona derive most of the company's homebuilding revenue, followed by Utah, and Virginia. | SH Residential Holdings LLC | 4,642,866 | 461,396 | 9.9% | 6,592,301 | 1.4x | 14.3x |
| 4/1/2024 | Antares Acquisition, LLC | Antares Acquisition, LLC (d.b.a Antares Homes) is a Texas limited liability company. The company's operations consist primarily of acquiring developed lots in subdivisions throughout Johnson, Kaufman, Hood, Denton, Ellis, Parker and Tarrant Counties and building single family homes on these lots using standard floor plans ranging from approximately 1,500 to 4,500 square feet. Homes are built in a production environment on both a speculative and a pre-sold basis. | Landsea Homes Corporation | 171,142 | NA | NA | 239,803 | 1.4x | NA |
| 5/11/2023 | JM AB (publ) | JM AB (publ) constructs, develops, and sells housing and residential areas in the Nordic region. It operates through JM Residential Stockholm, JM Residential Sweden, JM Norway, JM Finland, and JM Property Development segments. The company also engages in the acquisition of development properties; planning, pre-construction, production, and sale of residential units; development of rental units, residential care units, and commercial properties; provision of economic and technical management, and housing services to tenant-owners associations; and contract works in the Greater Stockholm area. JM AB (publ) was incorporated in 1945 and is headquartered in Solna, Sweden. | NA | 1,660,459 | 237,534 | 14.3% | 2,181,727 | 1.3x | 9.2x |
| 6/30/2022 | Solon Eiendom ASA | Solon Eiendom ASA acquires, develops, and sells residential real estate properties in Norway. The company was formerly known as Bionor Pharma ASA and changed its name to Solon Eiendom ASA. The company was founded in 2006 and is based in Oslo, Norway. As on January 20, 2022, Solon Eiendom ASA was taken private. Solon Eiendom ASA operates as a subsidiary of OBOS BBL. | OBOS BBL | 240,076 | 34,041 | 14.2% | 710,450 | 3.0x | 20.9x |
| 12/22/2021 | Solon Eiendom ASA | Solon Eiendom ASA acquires, develops, and sells residential real estate properties in Norway. The company was formerly known as Bionor Pharma ASA and changed its name to Solon Eiendom ASA. The company was founded in 2006 and is based in Oslo, Norway. As on January 20, 2022, Solon Eiendom ASA was taken private. Solon Eiendom ASA operates as a subsidiary of OBOS BBL. | OBOS BBL; Samhällsbyggnadsbolaget i Norden AB (publ) | 261,358 | 37,058 | 14.2% | 808,264 | 3.1x | 21.8x |

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.6

Contender Development, Inc.
As of September 3, 2025

## Comparative Transaction Multiples

*(in USD Thousands)*

| Sale Date | Target Name | Target Description | Acquirer Name | Revenue | EBITDA | EBITDA Margin % | Enterprise Value | EV / Revenue | EV / EBITDA |
|---|---|---|---|---|---|---|---|---|---|
| 9/15/2021 | Genesis Land Development Corp. | Genesis Land Development Corp., an integrated land developer and residential home builder, owns and develops residential lands and serviced lots in the Calgary Metropolitan Area, Canada. It operates through Land Development and Home Building segments. The Land Development segment acquires, plans, rezones, subdivides, services, and sells residential lots, and commercial and industrial lands to third-party developers and builders; and sells lots and completed homes. Its Home Building segment plans, develops, and sells single-family lots and townhomes, multi-family, and commercial parcels. The company was formerly known as Genesis Capital Corp. and changed its name to Genesis Land Development Corp. in October 1998. Genesis Land Development Corp. was founded in 1991 and is based in Calgary, Canada. | Smoothwater Capital Corporation | 77,333 | 9,251 | 12.0% | 93,823 | 1.2x | 10.1x |
| 6/7/2021 | JM AB (publ) | JM AB (publ) constructs, develops, and sells housing and residential areas in the Nordic region. It operates through JM Residential Stockholm, JM Residential Sweden, JM Norway, JM Finland, and JM Property Development segments. The company also engages in the acquisition of development properties; planning, pre-construction, production, and sale of residential units; development of rental units, residential care units, and commercial properties; provision of economic and technical management, and housing services to tenant-owners associations; and contract works in the Greater Stockholm area. JM AB (publ) was incorporated in 1945 and is headquartered in Solna, Sweden. | Samhällsbyggnadsbolaget i Norden AB (publ) | 1,936,592 | 248,353 | 12.8% | 3,392,250 | 1.8x | 13.7x |
| 4/21/2021 | Abbey plc | Abbey plc, together with its subsidiaries, engages in the building and property development, plant hire, and property rental activities in the Republic of Ireland, the United Kingdom, and the Czech Republic. The company is involved in the residential housing and land development activities. It also engages in the hire, rental, sale, and maintenance of construction plant, vehicles, tools, and portable buildings. The company is based in Dublin, the Republic of Ireland. Abbey plc is a subsidiary of Gallagher Holdings Limited. | Gallagher Holdings Ltd | 230,845 | 50,517 | 21.9% | 303,940 | 1.3x | 6.0x |
| 3/31/2020 | Noratis AG | Noratis AG, a real estate company, invests in, develops, manages, and sells residential property portfolios in Germany. It primarily focuses on a portfolio of apartments, residential areas, and housing estates. The company also invests in retail store properties. Noratis AG was founded in 2002 and is based in Eschborn, Germany. | Merz Real Estate GmbH & Co. KG | 81,282 | 17,067 | 0 | 265,555 | 3.3x | 15.6x |
| 1/1/2019 | Terramor Homes | Operator of a homebuilder company in Raleigh, North Carolina. The company's floor plan designs meet the new trends of today's buyers, enabling home owners to find a quality home that suits their unique lifestyle. | D.R. Horton, Inc. | 85,700 | NA | NA | 325,900 | 3.8x | NA |
| 10/5/2017 | Forestar Group Inc. | Forestar Group Inc. operates as a residential lot development company in the United States. The company acquires land and develops infrastructure for single-family residential communities. It sells its residential single-family finished lots to local, regional, and national homebuilders. The company was incorporated in 2005 and is headquartered in Arlington, Texas. Forestar Group Inc. operates as a subsidiary of D.R. Horton, Inc. | D.R. Horton, Inc. | 182,001 | 54,646 | 30.0% | 545,890 | 3.0x | 10.0x |

*(in USD Thousands)*

| Enterprise Value Multiples (All Transactions) | Revenue | EBITDA | EBITDA Margin % | Enterprise Value | EV / Revenue | EV / EBITDA |
|---|---|---|---|---|---|---|
| Low | 77,333 | 9,251 | 9.9% | 93,823 | 1.1x | 6.0x |
| 25th Percentile | 171,142 | 35,550 | 12.4% | 303,940 | 1.3x | 9.6x |
| **Average** | **1,273,108** | **184,791** | **16.1%** | **1,823,130** | **2.1x** | **12.7x** |
| **Median** | **240,076** | **54,646** | **14.2%** | **710,450** | **1.4x** | **10.1x** |
| 75th Percentile | 1,936,592 | 307,849 | 18.4% | 3,081,392 | 3.0x | 14.9x |
| High | 4,642,877 | 515,487 | 30.0% | 6,592,301 | 3.8x | 21.8x |

*(in USD Thousands)*

| Enterprise Value Multiples (Transactions from 1/1/2022 to 9/3/2025) | Revenue | EBITDA | EBITDA Margin % | Enterprise Value | EV / Revenue | EV / EBITDA |
|---|---|---|---|---|---|---|
| Low | 171,142 | 34,041 | 9.9% | 239,803 | 1.1x | 8.4x |
| 25th Percentile | 595,172 | 237,534 | 11.1% | 1,078,269 | 1.3x | 9.2x |
| **Average** | **2,282,550** | **323,161** | **13.0%** | **2,994,178** | **1.6x** | **12.5x** |
| **Median** | **1,999,168** | **367,345** | **14.2%** | **2,631,560** | **1.4x** | **10.0x** |
| 75th Percentile | 4,066,619 | 461,396 | 14.3% | 4,639,896 | 1.4x | 14.3x |
| High | 4,642,877 | 515,487 | 15.7% | 6,592,301 | 3.0x | 20.9x |

***Footnotes:***

Source: S&P Capital IQ, DealStats, and PitchBook.

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.7

**Contender Development, Inc.**
As of September 3, 2025

## Project Summary

***(in USD Actual)***

| Project | Locaion | Total Lots | Total Acreage | Price Per Lot | Total Gross Revenue | Appraised Value (1) |
|---|---|---|---|---|---|---|
| Brickyard | Columbia, SC | 140 SF | 64.1 | $105,000.00 | $14,700,000.00 | $575,000.00 |
| Chestnut Crossing | Greenwood, SC | 145 SF | 82.8 | $120,500.00 | $15,367,998.00 | $1,810,000.00 |
| Dusty Road | Newberry, SC | 432 SF | 165.23 | $107,000.00 | $42,162,815.00 | na |
| Freedom Florence | Florence, SC | 168 SF | 71.48 | $114,500.00 | $19,668,762.00 | na |
| Hardscrabble | Columbia, SC | 221 SF | 77.78 | 52': $109,900.00 | $24,972,848.00 | $3,520,000.00 |
| Hawksbill | Hampstead, NC | 519 SF<br>586 TH<br>**1,105** | 376.34 | 50': $176,000.00<br>60': $200,000.00<br>70' AR: $200,000.00<br>80' AR: $227,000.00<br>80' WF: $500,000<br>DPL: $132,000.00<br>TH: $107,000<br>TH RL: $107,000 | $212,639,297.00 | na |
| Highway 357 | Lyman, SC | 36 SF | 38.33 | $210,000.00 | $6,463,422.00 | na |
| Kendrick Creek | Kingsport, TN | 157 SF | 105.7 | 50': $135,000.00<br>61': $145,000.00 | $22,577,545.00 | na |
| Midway | Bolivia, NC | 3,630 Mix | 1502.19 | 51': $115,000.00<br>41': $85,000.00<br>51' AR: $155,000.00<br>61' AR: $165,000.00<br>71' AR DPL: $100,000<br>67' DPL: $85,000.00 | $430,260,895.00 | na |
| Mountain Drive | Columbia, SC | 255 SF | 160.34 | 42': $99,900.00 | $22,033,115.00 | $1,835,000 |
| Oak Hills | Columbia, SC | 915 SF<br>230 TH<br>**1,145** | 479.7 | 55': $95,000.00<br>60': $107,500.00<br>75': $117,500.0<br>20' TH: $85,000.00 | $116,019,919.00 | $52,045,000 |
| Oak Hills II | Columbia, SC | 208 SF<br>155 TH<br>**363** | 107 | 52': $127,500.00<br>22' TH: $85,000.00 | $41,307,276.00 | $1,680,000 |
| Raeford | Fayettville, NC | 191 SF | 104.33 | 80': $105,000.00 | $20,055,000.00 | na |
| Ray Road | Fayettville, NC | 199 SF | 138 | 70': $115,000.00 | $22,885,000.00 | na |

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# Exhibit A.7

**Contender Development, Inc.**
As of September 3, 2025

## Project Summary

*(in USD Actual)*

| Project | Locaion | Total Lots | Total Acreage | Price Per Lot | Total Gross Revenue | Appraised Value |
|---|---|---|---|---|---|---|
| Rice Creek | Leland, NC | 20' TH: 559 | 1134 | 20' TH: $100,000 | $289,880,000.00 | na |
| | | 50': 477 | | 50': $120,000.00 | | |
| | | 60': 382 | | 60': $135,000.00 | | |
| | | 28' DPL: 204 | | 28' DPL: $105,000.00 | | |
| | | 30' DPI AR: 184 | | 30' DPI AR: $105,000.00 | | |
| | | 50' AR: 269 | | 50' AR: $155,000.00 | | |
| | | 60' AR: 259 | | 60' AR: $165,000.00 | | |
| | | **2,334** | | | | |
| Ridge Road | North Augusta, SC | 2,348 SF | 1010.55 | 52': $120,000.00 | $301,560,180.00 | $11,560,000 |
| | | 389 TH | | 42': $115,000.00 | | |
| | | **2,737** | | 24' TH: $85,000.00 | | |
| | | | | 20' TH: $80,000.00 | | |
| Rockgate | Columbia, SC | 217 SF | 77.39 | $110,000.00 | $20,750,730.00 | $3,650,000 |
| Ted Farms | Columbia, SC | 195 SF | 83.48 | $109,900.00 | $20,400,649.00 | na |
| Wakefield | Columbia, SC | 604 SF | 249.52 | 42': $97,500.00 | $80,100,563.00 | na |
| | | 155 TH | | | | |
| | | **759** | | | | |
| Catawba | Lancaster, SC | 1,490 SF | 840.9 | 47': $94,800.00 | $154,000,000.00 | na |
| | | | | 57': $104,900.00 | | |
| | | | | 67': $114,900.00 | | |
| Mallard | Smithfield, NC | 873 SF | 489.2 | 20': $75,000.00 | $172,000,000.00 | na |
| | | 454 TH | | 24': $84,000.00 | | |
| | | **1,327** | | 42': $122,000.00 | | |
| | | | | 51': $165,000.00 | | |
| Pearson | Moore, SC | 1,035 SF | 552.45 | 20': $69,000.00 | $109,000,000.00 | na |
| | | 134 TH | | 42': $72,900.00 | | |
| | | **1169** | | 52': $79,900.00 | | |
| MacGregor | Greenville, NC | 585 SF | 331.97 | 20': $100,000.00 | $95,000,000.00 | na |
| | | 131 TH | | 43': $110,000.00 | | |
| | | **716** | | 53': $120,000.00 | | |
| **Total Appraised Value** | | | | | | **76,675,000** |

***Footnotes:***

(1) Appraisal reports were provided by Management.




# APPENDIX II
# VALUATION CERTIFICATION

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# VALUATION CERTIFICATION

**I certify that, to the best of my knowledge and belief:**

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.
4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.
6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
7. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the American Institute of Certified Public Accountants' ("AICPA") Statement of Standards for Valuation Services, Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset (VS Section 100).
8. No person other than those acknowledged in this report provided significant business appraisal assistance to the person signing this certification.

**Primary Analyst(s):**

Anthony Doughty
______________________________ ___10/02/2025_____

Anthony Doughty, CFA Date

______________________________ ___10/02/2025_____

Joice Pharris, ABV Date

**Contributing Analyst(s):**

Rahul Singh

Francesco Armstrong

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5



CohnReznick

# APPENDIX III
# ANALYST QUALIFICATIONS

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# ANALYST QUALIFICATIONS



## Anthony Doughty, CFA

Partner, Valuation Advisory Services

1 S. Wacker Drive, Suite 3550
Chicago, IL 60606
312-854-1272
anthony.doughty@cohnreznick.com
www.cohnreznick.com

Anthony is a Partner in CohnReznick's Valuation Advisory Services practice, based in the Chicago office. With over 25 years of experience, he specializes in performing valuations for firms across various industries, including pharmaceuticals and medical devices, diversified industrials, automotive, consumer products, technology, alternative investments, and financial services.

Anthony has extensive experience in a wide variety of valuation assignments, such as business enterprises, purchase price allocations (ASC 805), goodwill and other indefinite-lived asset impairments (ASC 350/ASC 360), financial instruments, stock options/incentive plans (ASC 718 and IRC 409A), estate and gift tax, and strategic planning.

Before joining CohnReznick, Anthony spent over 25 years at Big 4 accounting firms within their Advisory and Valuation Services Practices.

Education

- Northern Illinois University – Bachelor of Science (B.S.), Finance

Professional Affiliations

- Chartered Financial Analyst (CFA)

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# ANALYST QUALIFICATIONS



## Joice Pharris, ABV

### Director, Valuation Advisory Services

1 S. Wacker Drive, Suite 3550
Chicago, IL 60606
312-508-5917
joice.pharris@cohnreznick.com

Joice is a Director in the Valuation Advisory Services Practice at CohnReznick, based in Chicago. With nearly two decades of experience at a Big Four firm before joining CohnReznick, Joice specializes in advising clients on the valuation of business interests and intangible assets for various transactions, including mergers, acquisitions, venture capital funding, initial public offerings, carve-outs, divestitures, joint ventures, global tax restructuring, bankruptcy, internal reorganizations, and litigation.

Joice works across all major industries, with a particular focus on life sciences, healthcare, and consumer and industrial products. She has led transaction advisory engagements ranging from small to mega deals, regularly valuing business enterprises, intangible assets, inventory, rollover equity, and earn-outs. Joice is skilled in applying financial reporting standards and tax regulations to perform purchase price allocations, goodwill and indefinite-lived asset impairment tests, gift and estate tax valuations, IP valuations, and tax planning. As a thought leader on valuation technical topics and M&A trends, she collaborates with the assurance practice, clients, and regulators in auditing valuation analyses for both public and private companies.

Education

- M.B.A., DePaul University
- B.S. in Chemical Engineering, Universidad Central de Venezuela

Memberships and Professional Affiliations

- American Institute of Certified Public Accountants (AICPA), Accredited Business Valuation (ABV)

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5





CohnReznick

# APPENDIX IV
# VALUATION ASSUMPTIONS & LIMITING CONDITIONS

# VALUATION ASSUMPTIONS & LIMITING CONDITIONS

**Our valuation conclusions and the resulting Report are subject to the following assumptions and limiting conditions. These initial assumptions and limiting conditions may be modified by CohnReznick only as circumstances warrant.**

1. The financial statements and other related information supplied by the Company or its representatives have been accepted without any verification as fully and correctly reflecting the enterprise's business conditions and operating results for the respective periods. We have not audited, reviewed, or compiled the financial information provided to us and, accordingly, we express no audit opinion or any other form of assurance on this information.

2. If prospective financial information has been used in relation to the valuation services and resulting Report, we have not examined or compiled the prospective financial information and therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected, differences between actual and expected results may be material, and achievement of the forecasted results is dependent on the actions, plans, and assumptions of management.

3. Public, industry, statistical and other information furnished by others, upon which all or portions of this Report and its conclusions of value are based, is believed to be reliable. However, CohnReznick makes no representation as to the accuracy or completeness of such information and has performed no procedures to corroborate the information.

4. This Report may contain information obtained from third parties, including ratings from credit ratings agencies such as Standard & Poor's. Reproduction and distribution of third party content in any form is prohibited except with the prior written permission of the related third party. Third party content providers do not guarantee the accuracy, completeness, timeliness or availability of any information, including ratings, and are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, or for the results obtained from the use of such content. THIRD PARTY CONTENT PROVIDERS GIVE NO EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE. THIRD PARTY CONTENT PROVIDERS SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, EXEMPLARY, COMPENSATORY, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, COSTS, EXPENSES, LEGAL FEES, OR LOSSES (INCLUDING LOST INCOME OR PROFITS AND OPPORTUNITY COSTS OR LOSSES CAUSED BY NEGLIGENCE) IN CONNECTION WITH ANY USE OF THEIR CONTENT, INCLUDING RATINGS. Credit ratings are statements of opinions and are not statements of fact or recommendations to purchase, hold or sell securities. They do not address the suitability of securities or the suitability of securities for investment purposes, and should not be relied on as investment advice.

5. The Client and all recipients of the Report acknowledge and agree that, in rendering services hereunder, CohnReznick has been and will be relying on and assuming the accuracy of the information (including without limitation, financial forecasts and projections, historical financial statements, and other financial data) with respect to the Company furnished to CohnReznick by or on behalf of each entity and its agents, counsel, employees and representatives. CohnReznick does not assume responsibility for the accuracy and completeness of such information, and CohnReznick shall not be obligated to conduct any independent study or investigation as to the accuracy or completeness of the information.

6. The valuation services and the Report cannot be relied on to disclose errors, irregularities or illegal acts, including fraud or defalcations that may exist. No representation, liability or warranty for the accuracy of such items is assumed by or imposed on CohnReznick, and is subject to corrections, errors, omissions and withdrawal without notice.

7. Neither all nor any part of the contents of this Report shall be disseminated to the public or any other party through advertising media, public relations, news media, sales media, mail, direct transmittal or any other means of communication without the prior written consent and approval of CohnReznick.

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5

# VALUATION ASSUMPTIONS & LIMITING CONDITIONS

**(continued)**

8. This Report and the conclusion of value are for the exclusive and internal use of the Client for the sole and specific purposes as noted in the Report, and it shall not be used for any other purpose or by any other party for any purpose. Furthermore, the Report and conclusion of value are not intended by CohnReznick, and should not be construed by any recipient of the Report, to be investment advice in any manner whatsoever.

9. We are not required to provide future services regarding the subject matter of this Report, including but not limited to providing further consultation, giving testimony in court, or participating or being in attendance during any meetings, hearings, proceedings or depositions, with reference to the property being valued, unless previous arrangements have been made.

10. This Report and conclusion of value are valid only as of the Valuation Date contained in the Report. Events, conditions and circumstances occurring after the Valuation Date have not been considered. CohnReznick has no obligation to update our valuation, the Report or conclusion of value for such events, and conditions and circumstances.

11. No change of any item in this Report shall be made by anyone other than CohnReznick, and CohnReznick shall have no responsibility for any unauthorized change.

12. CohnReznick has relied on the representations of the owners, management, and other third parties concerning the value and useful condition of all equipment, real estate, and any other assets or liabilities, except as specifically stated to the contrary in this Report. CohnReznick has not attempted to confirm whether or not all assets of the business are free and clear of liens or encumbrances or that the Company has good title to all assets.

13. CohnReznick assumed that there is full compliance with all applicable federal, state, and local laws and regulations for the purpose of the valuation services and resulting Report unless otherwise specified in this valuation. No effort has been made to determine the possible effect, if any, on the subject business or property due to future Federal, state or local legislation, including any environmental or ecological matters or interpretations therefore, unless otherwise stated.

14. Neither the professionals who worked on this engagement nor CohnReznick have any present or contemplated future interest in the Company, any personal interest with respect to the parties involved, or any other interest that might prevent us from performing an unbiased valuation. CohnReznick's compensation is not contingent on an action or event resulting from the analysis, opinions, or conclusions in, or the use of, the valuation services or resulting Report.

15. This is a Summary Report which is intended to comply with the reporting requirements set forth by the American Institute of Certified Public Accountants ("AICPA") under Statement of Standards for Valuation Services, Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset (VS Section 100) for a Summary Report. The depth of discussion contained in this report is specific to the needs of the client and for the intended use herein. As such, it does not present a complete discussion of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's conclusion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in our files.

Docusign Envelope ID: 702265AF-E553-4D6F-9509-EB290AEF3DB5




**CohnReznick Advisory LLC**
1301 Avenue of the Americas
New York, NY 10019

Tel: 212-297-0400
cohnreznick.com

A member of Nexia International | CohnReznick is an independent member of Nexia International

docusign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 702265AF-E553-4D6F-9509-EB290AEF3DB5 | | Status: Completed |
| Subject: NIMISH PATEL Redemption Notice.FINAL.FINAL.pdf | | |
| Source Envelope: | | |
| Document Pages: 101 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Broadstreet Global Fund LLC. |
| AutoNav: Enabled | | 211 N. Main Street |
| EnvelopeId Stamping: Enabled | | Greenville, SC 29601 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | info@broadstreetglobalfund.com |
| | | IP Address: 24.158.68.206 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>11/20/2025 9:52:17 AM | Holder: Broadstreet Global Fund LLC.<br>info@broadstreetglobalfund.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| NIMISH PATEL<br>nimish9090@gmail.com<br>Electrical Engineer<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Pre-selected Style<br>Using IP Address:<br>2600:1700:9a0:2950:3cc6:bec5:2b1b:32ba | Sent: 11/20/2025 9:52:20 AM<br>Viewed: 11/20/2025 2:21:08 PM<br>Signed: 11/27/2025 7:29:35 PM |

**Electronic Record and Signature Disclosure:**
Accepted: 11/20/2025 2:21:08 PM
ID: 1b426d10-92eb-4650-bfad-c0ed0d161964

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Kevin Heinrich<br>kevin@broadstreetglobalfund.com<br>Kevin Heinrich<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 11/27/2025 7:29:37 PM |

**Electronic Record and Signature Disclosure:**
Accepted: 9/5/2024 5:51:21 AM
ID: 32827b14-118f-47ee-9a03-178916c70a77

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 11/20/2025 9:52:20 AM |
| Certified Delivered | Security Checked | 11/20/2025 2:21:08 PM |
| Signing Complete | Security Checked | 11/27/2025 7:29:35 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 11/27/2025 7:29:37 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure |
|---|

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Broad Street Global Fund (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Broad Street Global Fund:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: mb@broadstreetglobalfund.com

**To advise Broad Street Global Fund of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at mb@broadstreetglobalfund.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Broad Street Global Fund**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to mb@broadstreetglobalfund.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Broad Street Global Fund**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to mb@broadstreetglobalfund.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to ‘I agree to use electronic records and signatures’ before clicking ‘CONTINUE’ within the DocuSign system.

By selecting the check-box next to ‘I agree to use electronic records and signatures’, you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Broad Street Global Fund as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Broad Street Global Fund during the course of your relationship with Broad Street Global Fund.